IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| SARA BETH WILLIAMS, BRUCE KANE, JASON YEPKO, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, GRASS ROOTS NORTH CAROLINA, and RIGHTS WATCH INTERNATIONAL, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:22-cv-630 |
| v. | ) ) | |
| SHERIFF GARRY MCFADDEN, in his official capacity as Sheriff of Mecklenburg County and the MECKLENBURG COUNTY SHERIFF'S OFFICE | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs Sara Beth Williams, Bruce Kane, Jason Yepko, Gun Owners of America, Inc., Gun Owners Foundation, Grass Roots North Carolina, and Rights Watch International ("Plaintiffs"), by and through undersigned counsel, file this *Complaint* against Sheriff Garry McFadden, in his official capacity as Sheriff of Mecklenburg County, Mecklenburg County Sheriff's Office, and Josh Stein, in his official capacity as Attorney General of North Carolina, ("Defendants"), alleging violations of the right to keep and bear arms guaranteed by the Second Amendment to the United States Constitution, the right to Equal Protection of the laws and Due

Process of law guaranteed by the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983. Plaintiffs seek declaratory and injunctive relief, enjoining certain actions by Defendants which infringe Second Amendment rights, and declaring certain portions of N.C.G.S. § 14-415.13 through N.C.G.S. § 14-415.15 (collectively "Mental Health Provisions") unconstitutional for the same reasons. In support thereof, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1651, 2201, 2202, and 42 U.S.C. §§ 1983 and 1988.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

3.      Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business in Springfield, Virginia. GOA is organized and operated as a non-profit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code.  GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners.  GOA has more than 2 million members and supporters across the country, including many who reside throughout the state of North Carolina in Mecklenburg County, North Carolina, and throughout this district.  Many of these gun owners, like the individual Plaintiffs, wish to obtain a

Concealed Handgun Permit ("CHP"), have applied for such permit, but are being irreparably harmed by North Carolina law's grant of unbridled discretion to county sheriffs, and Defendant Sheriff Gary McFadden's failure to timely issue their CHPs or deny their applications through the capricious exercise of that discretion. *See* Declaration of Erich Pratt, Exhibit "1."

4.     Plaintiff Gun Owners Foundation ("GOF") is a Virginia not-for-profit, non-stock corporation, with its principal place of business in Springfield, Virginia. GOF is organized and operated as a non-profit legal defense and educational foundation that is exempt from federal income taxes under section 501(c)(3) of the United States Internal Revenue Code.  GOF is supported by gun owners across the country, including some who reside throughout the state of North Carolina and in Mecklenburg County, North Carolina, and within this district, whose rights are being infringed by the statute's grant of unbridled discretion to county sheriffs, and the deliberate actions of Defendant Sheriff Garry McFadden pursuant thereto. *See* Declaration of Erich Pratt, Exhibit "1."

5.     Plaintiff Grass Roots North Carolina ("GRNC") is a North Carolina non-stock corporation with its principal place of business in Raleigh, North Carolina.  GRNC is organized and operated as a non-profit membership organization that is exempt from federal income taxes under section 501(c)(4) of the United States Internal Revenue Code.  GRNC was formed in 1994 and is

dedicated to preserving constitutional freedoms.  Most, but not all, of the organization's projects are devoted to defending the individual right to keep and bear arms.  GRNC has thousands of members and supporters residing throughout North Carolina, including in Mecklenburg County, North Carolina, and within this district, whose rights are being infringed by state law and the deliberate actions of Defendant Sheriff Garry McFadden.  *See* Declaration of Paul Valone, Exhibit "2."

6.     Plaintiff Rights Watch International ("RWI") is a North Carolina not-for-profit, non-stock corporation, with its principal place of business in Raleigh, North Carolina.  RWI is organized and operated as a non-profit legal defense and educational foundation that is exempt from federal income taxes under section 501(c)(3) of the United States Internal Revenue Code.  RWI is supported by gun owners across the country, including some residing throughout North Carolina and in Mecklenburg County, North Carolina, and within this district, whose rights are being infringed by state law and the deliberate actions of Defendant Sheriff Garry McFadden. *See* Declaration of Paul Valone, Exhibit "2."

7.     Plaintiff Sara Beth Williams is a resident of Mecklenburg County, North Carolina, a law-abiding person who can legally possess firearms, and is not disqualified from obtaining a CHP.   Williams is a member of GOA and GRNC. Williams does not currently own a handgun, but intends to obtain one after receiving her CHP.  Williams submitted her CHP application with the

Mecklenburg County Sheriff's Office on November 9, 2021, and then waited more than three months to be fingerprinted on February 23, 2022, meaning her application for a CHP was complete as of that date. *See* Declaration of Sara Beth Williams, Exhibit "3". Williams has now waited *more than a year* for Sheriff McFadden to issue her CHP, still without any end in sight. Defendant Sheriff Garry McFadden's failure to timely issue Williams a CHP is an infringement not only of her right to bear arms in public for self-defense but also her right to even acquire a handgun to keep for self-defense within her home.

8. Plaintiff Bruce Kane ("Kane") is a resident of Mecklenburg County, North Carolina, a law-abiding person who can legally possess firearms, and is not disqualified from obtaining or renewing a CHP. Kane is a member of GOA and GRNC. Kane has a CHP issued by Mecklenburg County, but it expired on October 30, 2022. Prior to its expiration and, in compliance with N.C. Gen. Stat. § 14-415.16, Kane sought renewal of his CHP from Defendant McFadden on July 11, 2022. However, Kane travels extensively for work and carries his firearm with him where it is legal do so. Kane's CHP shows on its face that it expired as of October 30, 2022 and, although it is still valid in North Carolina pursuant to § 14-415.16, Kane is at greater risk of being cited or arrested while out of state, if he carries a concealed firearm, as any out of state officer may not have access to North Carolina's permitting system showing that Kane's CHP is valid,

notwithstanding its expiration date. Thus, Kane has been refraining from exercising his Second Amendment rights in other states, due to Defendant McFadden's delay in renewing his CHP. Indeed, to date, Defendant McFadden has not advised Kane when he should expect his permit to be renewed. *See* Declaration of Bruce Kane, Exhibit "4." Defendant Sheriff Garry McFadden's failure to timely renew Kane's CHP is an infringement of Kane's right to bear arms in public for self-defense.

9.     Plaintiff Jason Yepko ("Yepko") is a resident of Mecklenburg County, North Carolina, a law-abiding person who can legally possess firearms, and is not disqualified from obtaining or renewing a CHP. Kane is a member of GOA and GRNC. Yepko has a CHP issued by Mecklenburg County, but it expired in January of 2022. Prior to its expiration and, in compliance with N.C. Gen. Stat. § 14-415.16, Yepko sought renewal of his CHP from Defendant McFadden in October of 2021. Having received no response, in March of 2022 Yepko wrote a letter to the Sheriff's office, inquiring as to the status of his renewal. Yepko was advised that he needed to sign an additional document, which he immediately signed and returned. Had Yepko received timely notice from the Sheriff of this alleged deficiency in his application, he would have completed the additional task rather than discovering it only after inquiry to the Sheriff. Since his prior permit expired prior to his completing all the requirements to renew, Yepko does not

6

know if his permit is still valid pursuant to § 14-415.16, as he may fall outside of the safe harbor provision of the statute, as his additional paperwork was completed only after his permit had expired. As such, Yepko refrains from carrying a concealed firearm because he does not wish to risk being arrested for carrying a concealed firearm without a valid permit. Defendant McFadden has not provided Yepko with an estimated date as to when his CHP will be renewed. *See* Declaration of Jason Yepko, Exhibit "5." Defendant Sheriff Garry McFadden's failure to timely renew Yepko's CHP is an infringement of his right to bear arms in public for self-defense.

10.     In addition to the individual plaintiffs, many other of GOA, GOF, GRNC, and RWI (collectively referred to as "Organizational Plaintiffs") members and supporters are suffering the same harms. Many of these irreparable harms to the members and supporters of the Organizational Plaintiffs, which are permitted and made possible by the "open-ended discretion" granted to North Carolina sheriffs by the state Mental Health Provisions, are alleged herein by the Organizational Plaintiffs in a representational capacity on behalf of, and asserting the interests of, their members and supporters. Each of these persons would have standing to challenge the Mental Health Provisions and Defendants' actions in their own right. Protection of these persons' rights and interests is germane to the Organizational Plaintiffs' mission, which is to preserve and protect the Second

Amendment and the rights of Americans to keep and bear arms, including against infringement by anti-gun politicians and unconstitutional state statutes. Litigation of the challenges raised herein does not require participation of each of the Organizational Plaintiffs' members and supporters. The Organizational Plaintiffs are capable of fully and faithfully representing the interests of their members and supporters without participation by each of these individuals. Indeed, the Organizational Plaintiffs routinely litigate cases on behalf of their members and supporters.

11. The members and supporters of the Organizational Plaintiffs represent a diverse group of individuals across North Carolina, including those residing in Mecklenburg County, North Carolina, who desire to receive a CHP so that they may exercise their Second Amendment right to bear arms in public, but who are being prohibited from doing so because of the challenged Mental Health Provisions and the challenged actions of Defendant Sheriff Garry McFadden.

12. Defendant Sheriff Garry McFadden ("Sheriff McFadden") is sued in his official capacity as the Sheriff of Mecklenburg County, North Carolina, and is the official required by North Carolina law to issue a CHP to qualified applicants in Mecklenburg County, North Carolina.

13. Defendant Mecklenburg County Sheriff's Office ("MCSO") is a separate and distinct legal entity established by the North Carolina Constitution

and North Carolina General Statutes and is a duly organized police organization within Mecklenburg County, North Carolina.

14. Sheriff McFadden and the MCSO are referred to collectively/ interchangeably as Sheriff McFadden/Sheriff/Sheriff's Office.

15. Defendant Josh Stein ("Attorney General Stein") is notified in his official capacity as the Attorney General of North Carolina pursuant to Rule 5.1 of the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

### A. Procedural History and Background.

16. In August of 2021, the Organizational Plaintiffs, along with several of their members and supporters, brought suit against Sheriff McFadden and MCSO in North Carolina state court in Mecklenburg County. *See Gun Owners of America, Inc. v. McFadden*, 21-CVS-12654, General Court of Justice, Superior Court Division.

17. That case involved a challenge to Sheriff McFadden's refusal to schedule CHP fingerprinting appointments for many months and, in some cases, over a year. Sheriff McFadden had claimed that a CHP application was not deemed submitted (and therefore the 45-day statutory clock to issue or deny a permit did not start ticking) until a person had submitted all the necessary items (including fingerprints), and that it was in Sheriff McFadden's sole discretion

9

when (if at all) to allow such fingerprinting to occur, thereby thwarting the statutory time frame.

18.     On May 3, 2022, the state court issued a preliminary injunction against Sheriff McFadden, enjoining his continued violation of North Carolina law, and ordering Sheriff McFadden and MCSO to provide fingerprinting services within five business days of receiving all other parts of a CHP application. Then, on June 7, 2022, the court ratified a consent judgment agreed to by the parties, wherein Sheriff McFadden agreed to provide fingerprinting services "during normal business hours within the same day that the applicant presents to the MCSO for fingerprinting."

19.     However, although now able to obtain timely fingerprinting services and submit their CHP applications when desired, Mecklenburg County residents have continued to suffer from lengthy, months-long delays in receiving their CHPs, in violation of their right to bear arms under the Second Amendment to the United States Constitution.

20.     The cause of these new CHP delays arises from Sheriff McFadden's idiosyncratic decision to make numerous irrelevant mental health records requests to various facilities and agencies, including to the Department of Veterans Affairs ("VA") within the federal government.

21. Few if any other North Carolina sheriffs make such mental health requests before issuing CHPs and, not coincidentally, those sheriffs are able to issue or deny all CHP applications within the statutory 45-day window. Yet what takes other North Carolina sheriffs days or weeks to accomplish, Sheriff McFadden is dragging out for anywhere from many months to over a year.

22. In other words, Sheriff McFadden has seized on the discretionary latitude granted by the Mental Health Provisions to create and impose significant delays on the CHP process for law-abiding residents of Mecklenburg County, only to throw up his hands and claim that the matter of receiving mental health records is completely outside his control.

23. Both Sheriff McFadden's actions, and the Mental Health Provisions permitting him the discretion to egregiously delay the CHP process for law-abiding residents of Mecklenburg County, infringe Plaintiffs' Second Amendment rights.

24. In violation of the Supreme Court's teachings in *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022), the Mental Health Provisions "grant open-ended discretion to licensing officials" (in this case, North Carolina sheriffs), permitting them wide discretion to make requests for mental health records. The result of Sheriff McFadden's use of this "open-ended discretion" is "abusive ends," namely "lengthy wait times in processing licensing applications," which "den[ies] citizens their right to public carry." *Id*. at 2139 n.9.

**B. The Supreme Court's Explication of the Second Amendment.**

25.     The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

26.     In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia. *Heller*, 554 U.S. at 581. Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to individuals the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id*. at 592.

27.     Then, in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *Id*. at 791.

28.     In *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Supreme Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding …" and that this "Second Amendment right is fully applicable to the States." *Id*. at 411, 416.

29.     Finally, as the Supreme Court has now explained in *Bruen*, the

Second and Fourteenth Amendments together guarantee individual Americans not

only the right to "keep" firearms in their homes, but also the right to "bear arms,"

meaning "to carry a handgun for self-defense outside the home," free from

infringement by either federal or state governments. *N.Y. State Rifle & Pistol Ass'n*

*v. Bruen*, 597 U.S. 2122.

30.     Importantly, in addition to clearly recognizing the right of "'law-

abiding, responsible citizens' … to public carry" (*id*. at 2138, n.9), *Bruen* also

rejected outright the methodology used within this Circuit and other circuits to

judge Second Amendment challenges.

31.     Prior to *Bruen*, the U.S. Court of Appeals for the Fourth Circuit had

adopted a two-part test for analyzing Second Amendment cases:

> [W]e have concluded that a two-part approach to Second Amendment
> claims seems appropriate under *Heller*. Pursuant to that two-part
> approach, we first ask whether the challenged law imposes a burden
> on conduct falling within the scope of the Second Amendment's
> guarantee. If the answer is no, then the challenged law is valid. If,
> however, the challenged law imposes a burden on conduct protected
> by the Second Amendment, we next apply[] an appropriate form of
> means-end scrutiny…. [W]e … select between strict scrutiny and
> intermediate scrutiny…. [T]he level of scrutiny we apply depends on
> the nature of the conduct being regulated and the degree to which the
> challenged law burdens the right. *Kolbe v. Hogan*, 849 F.3d 114, 132-
> 133 (4th Cir. 2017).

*See also Bruen* at 2127, n.4 (collecting cases using two-part test). Other circuits

had adopted and used a substantially similar formula, which invariably utilized the

very same "judge-empowering 'interest-balancing inquiry'" that *Heller* had explicitly rejected. *See Heller* at 634; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017), *aff'd* 742 Fed. Appx. 218 (9th Cir. 2018) ("the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit.").

32.     Rejecting this widespread atextual, "judge empowering" (*Bruen* at 2129) interest-balancing approach, *Bruen* directed (again) the federal courts back to first principles, to assess the text of the Second Amendment, informed by the historical tradition. *Bruen* at 2127.

33.     First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen* at 2126.

34.     Second, the Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (citation omitted).

35.     Third, in reviewing the historical evidence, the Court in *Bruen* cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment (but noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). *See Bruen* at 2135-2156 (discussing the lack of relevant historical prohibitions on concealed carry in public).

36.     In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "arm," then the ability to do so "shall not be infringed." Period. There are no "ifs, ands or buts," and it does not matter (even a little bit) how important, significant, compelling, or overriding the government's justification for or interest in infringing the right. It does not matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear

arms" was during the ratification of the Second Amendment in 1791, and perhaps

during ratification of the Fourteenth Amendment in 1868. *Bruen* at 2138

38. Lest there be any doubt, the Supreme Court has also instructed as to

the scope of the protected persons, arms, and activities covered by the Second

Amendment.

38. First, *Heller* explained that "in all six other provisions of the

Constitution that mention 'the people,' the term unambiguously refers to all

members of the political community, not an unspecified subset." *Heller* at 580.

*Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990),

which held that "'[T]he people' … refers to a class of persons who are part of a

national community or who have otherwise developed sufficient connection with

this country to be considered part of that community." *Id.*

39. Second, Heller then turned to the "substance of the right: 'to keep and

bear Arms.'" Id. at 581. The Court explained that "'[k]eep arms' was simply a

common way of referring to possessing arms, for militiamen and everyone else."

Id. at 583 (emphasis original). Next, the Court instructed that the "natural

meaning" of "bear arms" was "wear, bear, or carry ... upon the person or in the

clothing or in a pocket, for the purpose ... of being armed and ready for offensive

or defensive action in a case of conflict with another person." Id. at 584. And "[a]t

the time of the founding, as now, to 'bear' meant to 'carry.'" Id. Bruen, in fact, was

more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." Bruen at 2134.

40.     Third, with respect to the term "arms," the Court explained that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Heller at 582. Indeed, the "arms" protected by the Second Amendment include "weapons of offence, or armour of defence… Arms are any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." Heller at 581 (punctuation omitted).

41.     Finally, as relevant here, in addition to clearly establishing the framework by which lower courts are to analyze Second Amendment challenges, *Bruen* also acknowledged the inherent risk in all permitting schemes, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, *lengthy wait times in processing license applications* or exorbitant fees deny ordinary citizens their right to public carry." *Bruen* at 2138, n.9 (emphasis added).

**C. Federal Statutory Framework.**

42.     Federal law requires that applicants purchasing firearms from licensed firearm dealers must submit to a background check through the FBI's National Instant Criminal Background Check System ("NICS") system. 18 U.S.C. § 922(t).

17

43.    Many times, the NICS system quickly provides a "proceed" response to an FFL.  However, if the FBI does not "approve," but also fails to "deny" (resulting in a status of "delay"), the transaction within three business days, the FFL is authorized to transfer the firearm to the buyer. 18 U.S.C. § 922(t)(1)(B)(ii) (known as the "Brady transfer date").  However, as part of a recent congressional enactment, if the buyer is between the ages of 18 and 20 years old, an up to 10-business day waiting period applies.  18 U.S.C. § 922(t)(1)(C).

44.    18 U.S.C. § 922(g)(4) prohibits firearm ownership, inter alia, by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution."

45.    In 2007, the NICS system was amended through the NICS Improvement Amendments Act of 2007 ("NIAA"), to encourage states to connect state databases containing records of individuals adjudicated mentally incompetent to the NICS system:  "the State shall make electronically available to the Attorney General records relevant to a determination of whether a person is disqualified from possessing or receiving a firearm under subsection (g) or (n) of section 922 of title 18, United States Code." P.L. 110-180 (Jan. 10, 2008).

46.    North Carolina has complied with the NIAA. North Carolina General Code § 14-409.43 requires that "not later than 48 hours after receiving notice" of a determination that a citizen is "mentally ill" or has been "involuntarily committed"

to a mental health facility, the clerk of the superior court in the county in which the finding was made must "cause a record of the determination or finding to be transmitted to the National Instant Criminal Background Check System (NICS)."

47.     In other words, any North Carolina adjudications of mental illness or involuntary commitment within the state _already_ are promptly reported to and accessible from the NICS system.  Likewise, any federal records of mental health disqualifications (such as from the VA) are _already_ required be reported to and included in the NICS system.

**D. North Carolina Statutory Framework.**

48.     North Carolina law requires a person to obtain a pistol purchase permit ("PPP") or a CHP prior to purchasing a handgun[1]. N.C.G.S. § 14-402.

49.     Either a PPP or CHP (permitting not only firearm acquisition but also concealed carry) exempt a prospective handgun purchaser from undergoing an FBI background check at the point of sale.  See https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart.

50.     Without one of these permits issued by a North Carolina sheriff, a law-abiding person like Plaintiff Williams is entirely unable to obtain a handgun in North Carolina, because the requirement that she obtain government permission

---

[1] The Supreme Court in _Heller_, labeled handguns as the "quintessential self-defense weapon." _Heller_ at 629.

and pre-clearance applies both to sales at federally licensed firearms dealers (FFLs) and to sales between private individuals (as well as to gifts and inheritance). N.C.G.S. § 14-402.

51. To obtain a CHP, a citizen must seek approval from the local sheriff, irrespective of whether a citizen can pass a NICS check. N.C.G.S. § 14-415.11.

52. North Carolina law requires that sheriffs "shall issue" a CHP to those eligible applicants who seek them. N.C.G.S. § 14-415.11(b).

53. The law forbids issuance of a CHP to persons with felony records, pending felony charges, or misdemeanor crimes involving violence. N.C.G.S. § 14-415.12.

54. State law likewise forbids issuance of a CHP to anyone who "[i]s currently, or has been previously adjudicated by a court or administratively determined by a governmental agency whose decisions are subject to judicial review to be, lacking mental capacity or mentally ill." § 14-415.12(b)(6).

55. An individual must apply for a CHP with the "sheriff of the county in which the person resides." N.C.G.S. § 14-415.13.

56. The applicant must submit to the sheriff, inter alia, "[a] release … that authorizes and requires disclosure to the sheriff of any records concerning the mental health or capacity of the applicant." N.C.G.S. § 14-415.13.

57. To determine criminal backgrounds, the law requires that "the sheriff shall determine the criminal and background history of an applicant also by conducting a check through the National Instant Criminal Background Check System (NICS)." N.C.G.S. § 14-415.13. As noted above, this request already encapsulates a check for disqualifying mental health records.

58. Separately, a sheriff "shall make the request" for an applicant's mental health records "within 10 days of receipt" of a completed application, and such records "shall promptly (be) disclose[d] to the sheriff…" N.C.G.S. §§ 14-415.15(a); 14-415.14(c).

59. Of course, because of North Carolina's compliance with NIAA, any North Carolina adjudication of mental illness would be discovered in the NICS system whenever the sheriff conducts a NICS check for prohibiting records.

60. The language of the statute ordering compliance with mental health records requests from the sheriff indicates legislative intent that such records searches would encompass only records within the jurisdiction of North Carolina.

61. Yet nowhere does the N.C.G.S. § 14-415.15 prescribe, or limit, the agencies, institutions, or providers that a sheriff may consult in search of mental health records, leaving the search parameters for all practical purposes entirely with the open-ended discretion of individual sheriffs.

62.     Moreover, N.C.G.S. § 14-415.15 provides that "within 45 days after receipt of the items listed in G.S. 14-415.13 from an applicant, and receipt of the required records concerning the mental health or capacity of the applicant, the sheriff shall either issue or deny the permit" (emphasis added). But nowhere does the statute explain what happens if an agency (such as one within the federal government) does not respond, or respond timely.

63.     Likewise, the Mental Health Provisions do not limit the number of such requests for mental health records that may be made, nor limit the locations or entities to which such requests may be made.

64.     In other words, a sheriff in North Carolina has unrestricted discretion to make mental health record requests ranging widely in scope and geography. This open-ended discretion is the very sort rejected by the Supreme Court in Bruen, because it puts the timeliness of the licensing process entirely within the good graces of the sheriffs within North Carolina, and the entities to which requests for mental health records are made.

65.     The Mental Health Provisions also fail to place limits on the time period a sheriff is permitted to wait for a response to their request for mental health records.

66.     Furthermore, the Mental Health Provisions does not define how "promptly" an entity must respond to a request from a sheriff. Of course, even if

the Mental Health Provisions did provide a time frame, state law cannot bind the federal government or its agencies (such as the VA), or demand that they respond by a date certain (or at all). See Penn Dairies, Inc. v. Milk Control Comm'n, 318 U.S. 261, 269 (1943) ("We may assume also that, in the absence of Congressional consent, there is an implied constitutional immunity of the national government from state taxation and from state regulation of the performance, by federal officers and agencies, of governmental functions.").

67.     Although most North Carolina sheriffs are completing the entire CHP application process (including request and receipt of any needed mental health records) in mere days or a few weeks, Sheriff McFadden is somehow able to drag the process on for many, many months and, in some cases, over a year.

68.     This lengthy delay separately and additionally violates the Supreme Court's recent decision in Bruen, which explained that "lengthy wait times in processing license applications or exorbitant fees" can "deny ordinary citizens their right[s]" protected by the Second Amendment. *Id*. at 2138 fn. 9 (anticipating challenges on those bases).

### E. Sheriff McFadden Uses the Mental Health Provisions to Capriciously Deny Mecklenburg Residents their Second Amendment Right to Bear Arms

69.    Sheriff McFadden, as the Sheriff of Mecklenburg County, is the individual responsible for issuing CHPs to residents of Mecklenburg County, North Carolina.

70.    No provision exists under North Carolina law which allows Sheriff McFadden to refuse to process an application, nor to refuse or fail to fingerprint applicants as required under N.C.G.S. § 14-415.13.

71.    Subsequent to Plaintiffs' prior lawsuit against Sheriff McFadden to require him to perform his statutory duty to fingerprint CHP applicants, the MCSO's website2 now states that "fingerprint services will be on a first come, first served basis…. Prior to coming to the office to be fingerprinted for CHP or non-criminal fingerprints you must complete the online application. If you have not completed the application, you will be asked to step out and fill out the applications and return to the back of the line. When arriving at the Sheriff's Office please anticipate long wait times as applicants will be helped on a first come, first serve basis. We apologize for the inconvenience."

72.    According to MCSO documents obtained in that prior case against Sheriff McFadden, when Sheriff McFadden receives an application for a CHP, he

---

2  https://www.mecksheriff.com/index.php/gun-permits/ (last accessed 8/30/2022).

sends requests to five separate mental health providers seeking any records pertaining to the applicant. Among the providers are four state entities, along with the VA. Exhibit "6."[3]

73. According to the Sheriff's documents, each of the four private and/or state providers (Broughton Hospital, Novant Health, Carolinas Medical Center and Watkins sends a relatively prompt response to Sheriff McFadden (within days or weeks). See Exhibit "6."

74. However, as of April, 2022, the last month for which Plaintiffs were provided records, the VA had responded to only a handful of applications from October of 2021, very few from November 2021, and virtually none from December 2021 and April 2022.

75. Accordingly, numerous Mecklenburg County residents continue to wait more than six months merely for the VA to respond to Sheriff McFadden, and then up to an additional 45 days for the MCSO to process their CHP applications – including Plaintiff Williams, who continues to wait on her application submitted more than a year ago.

76. Sheriff McFadden's delay is wholly unnecessary, unreasonable and is an intentional act to deprive the residents of Mecklenburg County, North Carolina

---

[3] There appears to be a mistake in the spreadsheet that lists February 2022 through April 2022 gun permits as the year "2020," however the dates contained in the spreadsheet reflect the correct year.

of their right to bear arms as guaranteed by the Second Amendment to the United States Constitution.

77.     Indeed, since 1998, the VA has provided its mental health records to NICS.[4]

78.     Further, since 2013, the VA has been subject to a presidential executive order requiring all federal agencies to share mental health data with NICS.[5]

79.     Indeed, "According to the FBI, as of December 31, 2016, federal departments and agencies had contributed 173,083 records in the NICS index "adjudicated mental health" file, of which the VA contributed 167,815 (98.1%)."[6]

80.     Accordingly, Sheriff McFadden could have obtained the information he sought from the VA simply by running a NICS check (which he is required to do anyway).

---

[4] *See* Congressional Research Service, "Gun Control, Veterans Benefits, and Mental Incompetency Determinations" summary page (Apr. 5, 2017) ("Pursuant to the Brady Handgun Violence Prevention Act, 1993 … since 1998, the VA has provided records on beneficiaries for whom a fiduciary has been appointed to the Federal Bureau of Investigation (FBI) for inclusion in the National Instant Criminal Background Check System (NICS)"). In fact, "According to the FBI, as of December 31, 2016, the VA had contributed 167,815 records to "the NICS index 'adjudicated mental health' file"). *Id.*

[5] *See* "Presidential Memorandum – Improving Availability of Relevant Executive Branch Records to the National Instant Criminal Background Check System" (Jan. 16, 2013), available at https://obamawhitehouse.archives.gov/the-press-office/2013/01/16/presidential-memorandum-improving-availability-relevant-executive-branch.

[6] https://crsreports.congress.gov/product/pdf/R/R44818/3.

81.     Furthermore, Sheriff McFadden submits requests for records to the VA regardless of whether a person has ever served in the U.S. Armed Forces, an entirely unnecessary and pointless exercise for the large majority of CHP applicants.

82.     Sheriff McFadden is flouting the Second Amendment, and imposing lengthy wait times to process CHP applications on the theory that he must wait to receive certain mental health records when the identical information is available immediately through the same NICS check that the Sheriff must run as part of the CHP licensing process.  The Sheriff's unconstitutional actions have drawn out the CHP issuing process for more than a year, in violation of the Second Amendment and the Supreme Court's teachings in Bruen.

83.     Likewise, by granting vast, unfettered discretion to North Carolina sheriffs to request mental health records, the Mental Health Provisions themselves work as an unconstitutional infringement by permitting "lengthy wait times" of the sort the Supreme Court disapproved of in *Bruen*.  *Id.* at 2138 n.9.

### F. Sheriff McFadden's Actions Represent an Outlier Among North Carolina Sheriffs.

84.     By contrast to Sheriff McFadden, Ashe County, North Carolina appears to require only a search of Ashe County court records for any history of mental illness or commitment, before issuing PPP or a CHP.[7]

85.     Likewise, Rowan County appears to require a search only of Rowan County Court records.[8]

86.     Forsyth County's mental health release form names two local hospitals and the Forsyth County Clerk of Court as the three locations from which information is to be released.[9]

87.     Hertford County appears to require only a search of Hertford County Court records.[10]

---

[7]  *See* Ashe County Sheriff CHP website: ("Please note that as part of the application process, you will authorize the Ashe County Clerk of Superior Court to inform the Ashe County Sheriff's Office whether or not the Clerks' records contain the information of any involuntary mental commitment proceeding…. The purpose of this release is to enable the Sheriff to determine your qualification and competence to purchase and handle a handgun"); available at https://ashesheriff.com/gun-permits/.

[8]  *See* Rowan County Sheriff CHP website: ("I authorize the Rowan County Clerk of Courts to release mental health information to the Rowan County Sheriff's Office"); available at https://rowanso.permitium.com/ccw/application?permittype=new (pressing the "Agree" button six times brings up the final application page where the text appears).

[9]  *See* Forsyth County Sheriff's CHP website. https://www.co.forsyth.nc.us/Sheriff/assets/documents/MHForm.pdf.

[10]  *See* Hertford County Sheriff CHP website: ("In addition, by submitting this application, I authorize the Hertford County Clerk of Courts to release mental health information to the Hertford County Sheriff's Office"); available at https://hertfordso.permitium.com/ccw/application?permittype=new. (pressing the "Agree" button five times brings up the final application page where the text appears).

88. Sampson County appears to require only a search of Sampson County Court records.[11]

89. Numerous other North Carolina counties appear to follow a similar procedure.[12]

90. Sheriff McFadden thus stands alone and as an outlier, imposing unnecessary and unconstitutional delays on the CHP process in Mecklenburg County.

## G. The Mental Health Provisions and Sheriff McFadden's Actions Infringe Plaintiffs' Rights.

91. The Supreme Court made clear in Bruen that constitutional challenges would be appropriate to statutes and practices imposing "lengthy wait times in processing license applications … [which] deny ordinary citizens their right to public carry." Id. This is such a case.

92. Sheriff McFadden has access to the NICS system, already must run a NICS check prior to issuing a CHP, and could utilize the same system utilized by

---

[11] *See* Sampson County Sheriff CHP website: ("In addition, by submitting this application, I authorize the Sampson County Clerk of Courts to release mental health information to the Sampson County Sheriff's Office"); available at https://hertfordso.permitium.com/ccw/application?permittype=new. (pressing the "Agree" button seven times brings up the final application page where the text appears).

[12] *See, e.g.*, Buncombe County (https://buncombeso.permitium.com/ccw/application?permittype=new); Yancey County (https://yanceyso.permitium.com/ccw/application?permittype=new); Lincoln County (https://lincolnso.permitium.com/ccw/application?permittype=new);

firearms dealers across the country daily to determine whether applicants are prohibited from possessing firearms due to a mental health record.

93.    Instead, aided and abetted by the vast grant of discretion provided by the Mental Health Provisions, Sheriff McFadden arbitrarily chooses which providers to approach for records and, among those, selects a U.S. government agency which is not subject to North Carolina's requirement to "promptly" produce mental health records upon a sheriff's request, and which routinely takes at least six months to respond.

94.    Sheriff McFadden's actions and the Mental Health Provisions violate the rights of Plaintiffs and countless other North Carolinians to keep and bear arms.

95.    The Mental Health Provisions operate as a blanket authorization to anti-gun sheriffs such as Sheriff McFadden to infringe on Second Amendment rights arbitrarily and with impunity.  Both the Mental Health Provisions and Sheriff McFadden's actions taken pursuant thereto, violate constitutional rights and must be enjoined.

**COUNT I**
**VIOLATION OF THE UNITED STATES CONSTITUTION**
**SECOND AMENDMENT**

96.    Plaintiffs re-allege the preceding paragraphs as if set forth in full and further allege:

97.     The Mental Health Provisions and Sheriff McFadden's actions, both together and separately, infringe on the rights guaranteed to the Plaintiffs by the Second Amendment to the United States Constitution – rights that "shall not be infringed."

98.     The Individual Plaintiffs, as well as the members and supporters of the Organizational Plaintiffs, are members of "the people" who desire to "bear" a quintessential protected "arm" — a handgun — in public.

99.     Under Bruen, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather the government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  Bruen at 2126.

100.    Thus, the burden is on the Defendants to justify the unbridled discretion provided by the statute and the delays in processing CHP applications, as consistent with the historical tradition of the right to bear arms.

101.    There is no historical analogue for Sheriff McFadden and MCSO to impose the extra "red tape" by submitting requests for mental health records to multiple entities with the seeming intent to cause delays in the processing of the CHP applications.  Nor is there any analogue for a statute allowing for an open-

ended permitting process where literally unlimited delays are possible, permissible, and occurring. In fact, there is no founding era historical analogue for requiring a government permit to exercise the Second Amendment right to bear arms at all.

102. Nor is there even any need to conduct a search for historical analogues, as the Supreme Court in Bruen has already made it clear that statutes cannot grant "open-ended discretion," and already explained that licensing officials may not impose "lengthy wait times in processing." Id. at 2139 n.9.

103. On their face, Sheriff McFadden's delay tactics and the North Carolina Mental Health Provisions violate the Second Amendment, because they allow anti-gun sheriffs such as Sheriff McFadden to unreasonably delay (and thereby deny) North Carolinians' Second Amendment rights.

## COUNT II
## VIOLATION OF 42 U.S.C. § 1983, UNITED STATES CONSTITUTION SECOND AMENDMENT

104. Plaintiffs re-allege the preceding paragraphs as if set forth in full and further allege:

105. Defendants' practices and policies, by infringing the protections afforded to the Plaintiffs by the Second Amendment to the United States Constitution, damage Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such practices and policies.

32

106.    By infringing the Second Amendment right to bear arms in public, Defendants' actions violate the Second Amendment, which applies to Defendants by operation of the Fourteenth Amendment, as applied to the Individual Plaintiffs and the members and supporters of the Organizational Plaintiffs, and those actions are therefore invalid.

107.    42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

108.    For his arbitrary and capricious actions in requiring the Plaintiffs to wait indefinitely for the issuance of a permit, with the apparent intent to delay and to deny the Plaintiffs the exercise of their Second Amendment rights, Sheriff McFadden is liable to Plaintiffs pursuant to 42 U.S.C. §1983.

109.    By granting Sheriff McFadden unbridled discretion to violate Plaintiffs' rights through use of the Mental Health Provisions, Defendant Stein is liable to Plaintiffs pursuant to 42 U.S.C. §1983.

## COUNT III
## VIOLATION OF 42 U.S.C. § 1983, UNITED STATES CONSTITUTION, FOURTEENTH AMENDMENT DUE PROCESS

110.   Plaintiffs re-allege the preceding paragraphs as if set forth in full and further allege:

111.   The Mental Health Provisions fail to provide any guidance to North Carolina sheriffs as to what government agencies or private health providers the sheriffs may or should contact to seek mental health records.

112.   Accordingly, as alleged above, the Mental Health Provisions has resulted in an arbitrary and capricious hodgepodge of policies across North Carolina counties, where residents of some counties can expect a search of local court records and a response to their CHP application in a reasonable time (permitting permits to be issued or denied within 45 days), while the residents of Mecklenburg County are required to wait more than one year (and potentially indefinitely) for Sheriff McFadden to search whatever agencies he arbitrarily chooses.

113.   Meanwhile, federal law already requires the VA to regularly submit mental health records to NICS, and North Carolina law already requires state entities to submit disqualifying records to NICS.

114. Thus, Sheriff McFadden could easily obtain the records instead he chooses to seek directly from an agency (the VA) that has delayed its response time by over six months.

115. The arbitrary actions of Sheriff McFadden, and the Mental Health Provisions which give Sheriff McFadden unfettered discretion to act arbitrarily, operate to infringe the Second Amendment rights of Plaintiffs, and thereby deny them due process of law.[13]

116. Accordingly, the Mental Health Provisions, and Sheriff McFadden's arbitrary actions thereunder, deny Plaintiffs their rights to Due Process of Law guaranteed under the Fourteenth Amendment of the United States Constitution.

## COUNT IV
## VIOLATION OF 42 U.S.C. § 1983, UNITED STATES CONSTITUTION FOURTEENTH AMENDMENT EQUAL PROTECTION

117. Plaintiffs re-allege the preceding paragraphs as if set forth in full and further allege:

---

[13] *See, e.g., Nebbia v. New York*, 291 U.S. 502, 539 (1934) (a statute may be held unconstitutional as a denial of due process "if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty"); *Interstate Commerce Com. v. Louisville & N. R. Co.,* 227 U.S. 88, 91 (1913) ("where rights depended upon facts, the [government actor] could disregard all rules of evidence, and capriciously make findings by administrative fiat. Such authority, however beneficently exercised in one case, could be injuriously exerted in another; is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power"); *Yick Wo v. Hopkins*, 118 U.S. 356, 369-370 ("When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest… we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power…. And the law is the definition and limitation of power….").

118. As alleged above, the Mental Health Provisions give no guidance and instead grant unfettered discretion to North Carolina sheriffs to determine from which institutions they will seek mental health records.

119. As further alleged above, due to the statute's grant of unbridled discretion to sheriffs, the Mental Health Provisions have been enforced with significant inequality across various North Carolina counties.

120. This selective enforcement has meant that law-abiding residents of some counties will have their right to keep and bear arms recognized in relatively short order, while others, such as citizens in Sheriff McFadden's Mecklenburg County, are required to wait more than one year, and potentially indefinitely, before their rights to keep and bear arms are vindicated.

121. The Supreme Court has recognized an Equal Protection claim "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

122. The Supreme Court has also noted that the express "purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution

Case 3:22-cv-00630-MOC-DSC   Document 1   Filed 11/28/22   Page 36 of 39

through duly constituted agents." Id. (quoting Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923) (emphasis added).

123.   In all material respects – aside from the identity of their local sheriffs – the residents of all North Carolina counties are similarly situated with respect to their entitlement to exercise their right to keep and bear arms.

124.   There is no lawful basis for the differential treatment the Mental Health Provisions allow North Carolina sheriffs such as Sheriff McFadden to impose upon their residents.

125.   Thus, the Mental Health Provisions impose entirely different "degrees" of Second Amendment rights upon North Carolina residents, based only upon the classification of the county in which they reside.

126.   Accordingly, both the "express terms" of the Mental Health Provisions and the "improper execution" inflicted by Sheriff McFadden's arbitrary actions, deprive Plaintiffs of the Equal Protection of the laws.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court grant judgment in their favor, including:

a.   An order preliminarily and permanently enjoining Defendant McFadden from impermissibly delaying the processing and issuance of concealed handgun permits;

37

b.     An order declaring that the challenged actions by Sheriff McFadden are unconstitutional;

c.     An order declaring that the challenged portions of the Mental Health Provisions are unconstitutional, insofar as they grant unfettered discretion to local sheriffs to determine what mental health records to seek, and how long to wait to receive them;

d.     An order directing Sheriff McFadden to, in every case, issue or deny Concealed Handgun Permits within the statutory timeframe of 45 days of receipt of an application;

e.     Attorneys' fees and costs to Plaintiffs pursuant to any applicable statute or authority, including 42 U.S.C. § 1988;

f.     Damages (including nominal damages) in an amount to be determined;

g.     Such other Declaratory relief consistent with the injunction as appropriate; and

h.     Any other relief that this Court in its discretion deems just and proper.

This 28th day of November, 2022.

/s/ Robert Neal Hunter, Jr.
Robert Neal Hunter, Jr.  (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone:   (336) 273-1600

Facsimile:    (336) 274-4650
Email:       rnhunterjr@greensborolaw.com

Ronald J. Shook, II  (NCSB 43407)
THE LAW OFFICES OF RONALD J. SHOOK
121 E. Main Ave.
Gastonia, NC 28012
Telephone:  704-671-2390
Facsimile:    704-671-4431
Email:       ron@rjshooklaw.com

*Attorneys for Plaintiffs*