IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:22-cv-630-MOC-DSC

| | |
|---|---|
| SARA BETH WILLIAMS, BRUCE KANE, JASON YEPKO, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, GRASS ROOTS NORTH CAROLINA, and RIGHTS WATCH INTERNATIONAL, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| SHERIFF GARRY MCFADDEN, in his official capacity as Sheriff of Mecklenburg County and the MECKLENBURG COUNTY SHERIFF'S OFFICE | ) ) ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**I.       Introduction.**

Plaintiffs ask this Court to exercise its equitable power to correct and prevent

ongoing and irreparable constitutional harms arising from Defendants' extraordinary

abuse of North Carolina statutory provisions which, in effect, allow an indefinite waiting

period for the issuance of a Concealed Handgun Permit in Mecklenburg County, North

Carolina – a permit without which Plaintiffs are impaired in exercising to exercise their

Second Amendment rights to acquire or bear arms.  By design and effect, Defendants

have made use of the open-ended discretion granted by the challenged state statute, deliberately drawing out the permitting process within Mecklenburg County for up to and exceeding an entire year. By contrast, the very same permits can be acquired in every other county across the state in just a few days or weeks.

Defendants' devious – and Byzantine – use of the statute has deprived Plaintiffs of the exercise of their rights to keep and bear arms secured by the Second Amendment to the United States Constitution, and incorporated against states and state actors via the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010). Suffering prolonged and indeterminate wait times to receive permits to which they are both constitutionally and statutorily entitled, Plaintiffs have waited long enough. Plaintiffs now request redress from this Court in the form of a preliminary injunction enjoining enforcement and application of the unconstitutional provisions of North Carolina law which have led to Defendants' abuses of the Second Amendment, and compelling Defendants immediately to issue or deny Plaintiffs' permits in compliance with the mandates of the Second Amendment, as interpreted by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

North Carolina law provides that Defendants must issue concealed handgun permits ("CHP") to qualified applicants "within 45 days after receipt of the [application] items . . . from an applicant, and receipt of the required records concerning the mental health or capacity of the applicant." N.C. Gen. Stat. § 14-415.15(a) (2022). The statute further provides that "[t]he sheriff shall make the request for any records concerning the mental health or capacity of the applicant within 10 days of receipt of the [application]

items." *Id.* Clearly, by imposing these strict time frames and permitting no deviation, the statute contemplates that North Carolina CHPs are to be issued by North Carolina sheriffs promptly, and without delay. In Mecklenburg County, however, Sheriff McFadden has chosen to deliberately abuse this time-sensitive licensing process, firing off numerous and irrelevant[1] mental health records requests to all manner of state and federal entities, including the Department of Veterans Affairs ("VA") – even when an applicant has never served in the military. Few if any other North Carolina sheriffs make such delay-oriented mental health requests before issuing CHPs and, not coincidentally, those sheriffs are able to issue or deny all CHP applications within the statutory 45-day window (if not much sooner than that). Yet what takes other North Carolina sheriffs days or weeks to accomplish, Sheriff McFadden drags out for anywhere from many months to over a year. In other words, Sheriff McFadden has seized on the discretionary latitude granted by the Mental Health Provisions to create and impose significant delays on the CHP process for law-abiding residents of Mecklenburg County, only to throw up his hands and claim that the months-long delays in receiving mental health records is completely outside of his control.

By twisting the mental health records provisions in this way, in order to toll the 45-day statutory licensing period indefinitely, Defendants have deprived Plaintiffs of permits – a precondition to lawful acquisition and concealed carrying of handguns – for

---

[1] As discussed in more detail *infra*, the statutory mental health provisions appear entirely irrelevant in the modern licensing scheme, as both federal and state law *already* require such records be submitted to the FBI's National Instant Background Check System ("NICS"), a background check which Defendants *already* must run on CHP applicants anyway.

many months and, in some cases, up to a year on end. *See* Compl. ¶¶ 7–12. As written, the mental health records provisions have enabled Defendants to transform the 45-day statutory permitting period into an open-ended process that has infringed, many times over, the natural right to keep and bear arms for self-defense which he Second Amendment commands "shall not be infringed."

In any event, separate and aside from Defendants' deliberately imposed delays on law-abiding gun owners within Mecklenburg County, the statute itself is unconstitutional, as it allows Defendants' actions, permitting the very same "abusive ends" in the form of "lengthy wait times in processing license applications," which the Supreme Court specifically rejected in *Bruen* as "denying ordinary citizens their right to public carry." *Id*. at 2139 n.9. As such, Plaintiffs request that this Court enjoin enforcement, application, and use of the mental health records provisions, and compel Defendants' immediate issuance or denial of handgun permits to Plaintiffs.

## II.   Plaintiffs Have Standing to Bring This Action

"To meet the constitutional minimum for standing, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751. This formula includes three elements: (1) injury in fact; (2) traceability; and (3) redressability." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)). "An organization has representational standing when (1) at least one of its members would have standing to sue in his own right; (2) the organization seeks to

protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc*., at 155 (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977).

### A. Injury In Fact

#### 1. Without a CHP, Plaintiff Williams Cannot Even Acquire a Handgun, and Is Unable to Exercise Her Right to Public Carry.

Plaintiff Sara Beth Williams ("Williams") is a resident of Mecklenburg County, North Carolina, a law-abiding person who can legally possess firearms, and is not disqualified from obtaining a CHP. Williams is a member of GOA and GRNC. Williams does not currently own a handgun but wishes and intends to obtain one after receiving her CHP. Williams submitted her CHP application with the Mecklenburg County Sheriff's Office on November 9, 2021, and then waited more than three months to be fingerprinted (the Sheriff's delay, not hers) on February 23, 2022, meaning her application for a CHP was complete as of that date. *See* Declaration of Sara Beth Williams, Complaint Exhibit "3." Williams waited more than a year for Sheriff McFadden to issue her CHP. Defendant McFadden's failure to timely issue Williams a CHP is an infringement not only of her right to bear arms in public for self-defense under *Bruen*, but also her right to even acquire a handgun to keep for self-defense within her home under *Heller*.

#### 2. Plaintiff Bruce Kane Is Unable to Have His Concealed Handgun Permit Renewed.

Plaintiff Bruce Kane ("Kane") is a resident of Mecklenburg County, North Carolina, a law-abiding person who can legally possess firearms, and is not disqualified

from obtaining or renewing a CHP. Kane is a member of GOA and GRNC. Previously, Kane had a CHP issued by Mecklenburg County, but it expired on October 30, 2022. Prior to its expiration and, in compliance with N.C. Gen. Stat. § 14-415.16, Kane sought renewal of his CHP from Defendant McFadden on July 11, 2022. Yet while Kane's expired CHP is purportedly still valid within North Carolina until Sheriff McFadden renews it, the same cannot be said when Kane, who travels extensively for work, carries his firearm outside the state. Indeed, Kane's CHP shows on its face that it expired as of October 30, 2022 and, although it is still valid in North Carolina pursuant to § 14-415.16, Kane is at a heightened risk of being cited or arrested while out of state, if he carries a concealed firearm, as an out-of-state officer may not have access to North Carolina's permitting system showing that Kane's CHP remains valid, notwithstanding its expiration date. Thus, Kane has refrained from exercising his Second Amendment rights in other states, due to Defendant McFadden's delay in renewing his CHP. Defendant McFadden has not advised Kane when he should expect his permit to be renewed. *See* Declaration of Bruce Kane, Complaint Exhibit "4." Defendant McFadden's failure to timely renew Kane's CHP is an infringement of Kane's right to bear arms in public for self-defense.

### 3. Plaintiff Jason Yepko Is Unable to Have His Concealed Handgun Permit Renewed.

Plaintiff Jason Yepko ("Yepko") is a resident of Mecklenburg County, North Carolina, a law-abiding person who can legally possess firearms, and is not disqualified from obtaining or renewing a CHP. Yepko is a member of GOA and GRNC. Previously, Yepko had a CHP issued by Mecklenburg County, but it expired in January of 2022.

Prior to its expiration and, in compliance with N.C. Gen. Stat. § 14-415.16, Yepko sought renewal of his CHP from Defendant McFadden in October of 2021. Having received no response, in March of 2022 Yepko wrote a letter to the Sheriff's office, inquiring as to the status of his renewal. Only then, Yepko was advised that he had needed to sign an additional document, which he immediately signed and returned. Had Yepko received timely notice from the Sheriff of this alleged deficiency in his application, he would have completed the additional task prior to his current permit expiring, rather than discovering the alleged omission only after inquiry to the Sheriff months later. Indeed, the Sheriff's failure even to process Yepko's initial application itself represents a statutory violation, as N.C. Gen. Stat. § 14-415.15(a) required that the Sheriff either grant or deny (including denying as incomplete) Yepko's application within 45 days and, if processed, to request mental health records within 10 days. In Yepko's case, the Sheriff's office complied with neither statutory requirement.

Since Yepko's prior existing permit expired before he completed all the requirements to renew, it seems that his permit may no longer be valid pursuant to § 14-415.16, and that he may fall outside of the safe harbor provision of the statute. As such, Yepko has refrained from carrying a concealed firearm, fearing arrest for carrying without a valid permit. Defendant McFadden has not provided Yepko with an estimated date as to when his CHP will be renewed. *See* Declaration of Jason Yepko, Complaint Exhibit "5." After the filing of this Complaint, Jason Yepko did receive his permit. However, Defendant McFadden's failure to timely renew Yepko's CHP is an infringement not only of his right to bear arms in public for self-defense, but also of his

right to acquire arms to keep and bear, as he may not acquire a handgun within North Carolina without a CHP.

### 4. Plaintiffs Gun Owners Foundation, Gun Owners of America, Inc., Grass Roots North Carolina and Rights Watch International.

GOA, GOF, GRNC, and RWI (collectively referred to as "Organizational Plaintiffs") have many members and supporters within Mecklenburg County who are suffering the same and similar harms as the individual named Plaintiffs. Many of these irreparable harms to the members and supporters of the Organizational Plaintiffs, which are permitted and made possible by the "open-ended discretion" granted to North Carolina sheriffs by the state Mental Health Provisions, are alleged herein by the Organizational Plaintiffs in a representational capacity on behalf of, and asserting the interests of, their members and supporters. *See Maryland Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246 (recognizing representational standing, and relying on *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977)). The members and supporters of the Organizational Plaintiffs represent a diverse group of individuals across North Carolina, including the individual Plaintiffs and others residing within Mecklenburg County who desire to receive a CHP so that they may exercise their Second Amendment right to bear arms in public, and to purchase a handgun, but who are being prohibited from doing so due to the challenged Mental Health Provisions and the challenged actions of Defendant McFadden.

### B. Traceability

#### 1. The Alleged Harms Are Directly Traceable to the Statute and Sheriff McFadden's Abuse of the Statute.

"To satisfy the traceability requirement, there must be a causal connection between the injury and the conduct complained of, rather than the injury occurring as a result of the independent action of some third party not before the court." *Daniels v. Arcade, L.P.*, 477 F. App'x 125, 129 (4th Cir. 2012) (punctuation and citation omitted). The Mental Health Provisions challenged herein, and Defendant McFadden's abuse of those provisions, are causally connected to the injuries complained of by Plaintiffs, as the provisions provide Defendant McFadden the cover he needs to delay the permitting process indefinitely, and his decision to drag out the permitting process has directly led to Plaintiffs' inability to exercise their constitutional rights.

### C. Redressability

"An injury is redressable if it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 903 (4th Cir. 2022) (punctuation and citations omitted). "A plaintiff's burden to establish redressability 'is not onerous': he must only 'show that [he] personally would benefit in a tangible way from the court's intervention.' *Deal*, 911 F.3d at 189 (quoting *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018))." *Id*. at 903. Should the Court hold the Mental Health Provisions challenged herein unconstitutional, Defendant McFadden would no longer be able to abuse those provisions to make numerous and irrelevant mental health records requests that are not germane to his

function of issuing CHPs. And were the Court to order Defendants to timely issue Plaintiffs' permits without delay, they would be free to acquire and carry handguns in public for self-defense. In other words, a decision from this Court would redress Plaintiffs' injuries.

## III.   A Preliminary Injunction Is Necessary to Prevent Continued and Irreparable Constitutional Harm.

A preliminary injunction requires Plaintiffs to "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A plaintiff need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Plaintiffs easily meet each factor.

### A.  Plaintiffs Are Likely to Succeed on the Merits.

#### 1.   Duplicative Requests for Mental Health Records Serve No Purpose.

As a preliminary matter, multiple requests for mental health records under the Mental Health Provisions are entirely unnecessary, a "prophylaxis-upon-prophylaxis"[2]

---

[2] *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 479, 127 S. Ct. 2652, 2672 (2007) (citation omitted). Of course, in the Second Amendment context, there no longer are any tiers of scrutiny to be applied. The point, however, is that even if the Mental Health Provisions otherwise were constitutional (they are not), they serve no actual purpose and cannot be used to justify an infringement of Second Amendment rights.

that does nothing but lead to unnecessary and lengthy delays in the permitting process.[3]

Indeed, federal law *already* requires that applicants purchasing firearms from licensed

firearm dealers must submit to a background check through the FBI's National Instant

Criminal Background Check System ("NICS") system. 18 U.S.C. § 922(t). Additionally,

18 U.S.C. § 922(g)(4) prohibits firearm ownership, *inter alia,* by anyone "who has been

adjudicated as a mental defective or who has been committed to a mental institution."

Moreover, North Carolina Law *already* requires a NICS check prior to the issuance of

any CHP by a sheriff. N.C.G.S. § 14-404(a)(1). In other words, whether acquiring a

firearm or acquiring a North Carolina CHP, a NICS check is required.

In 2007, the NICS system (operational in 1998) was amended through the NICS

Improvement Amendments Act of 2007 ("NIAA"), to encourage states to connect state

databases containing records of individuals adjudicated mentally incompetent to the

NICS system: "the State shall make electronically available to the Attorney General

records relevant to a determination of whether a person is disqualified from possessing or

receiving a firearm under subsection (g) or (n) of section 922 of title 18, United States

---

[3] North Carolina law provides that a "sheriff shall deny a permit to an applicant who" "[i]s currently or has been previously adjudicated by a court or administratively determined by a governmental agency whose decisions are subject to judicial review to be, lacking mental capacity or mentally ill. Receipt of previous consultative services or outpatient treatment alone shall not disqualify an applicant under this subdivision." N.C. Gen. Stat. § 14-415.12(b)(6). As discussed above, a NICS check would demonstrate whether any applicant has a prohibiting mental health record, yet N.C. Gen. Stat. § 14-415.13(a)(5) requires the applicant to provide the sheriff a "release ... that authorizes and requires disclosure to the sheriff of any records concerning the mental health or capacity of the applicant to be used for the sole purpose of determining whether the applicant is disqualified for a permit under the provisions of G.S. 14-415.12." And N.C. Gen. Stat. § 14-415.15(a) requires the sheriff to "make the request for any records concerning the mental health or capacity of the applicant within 10 days of receipt of the items listed in G.S. 14-415.13."

Code." P.L. 110-180 (Jan. 10, 2008). By statute, North Carolina has complied with the NIAA. North Carolina General Code § 14-409.43 requires that, "not later than 48 hours after receiving notice" of a determination that a citizen is "mentally ill" or has been "involuntarily committed" to a mental health facility, the clerk of the superior court in the county in which the finding was made must "cause a record of the determination or finding to be transmitted to the National Instant Criminal Background Check System (NICS)." In other words, North Carolina adjudications of mental illness or involuntary commitment within the state *already* are promptly reported to and accessible from the NICS system. Likewise, any federal records of mental health disqualifications (such as from the VA) are *already* required be reported to and included in the NICS system. In other words, both state and federal disqualifying mental health records *already* appear in the NICS system, making Defendants' numerous requests for mental health records redundant and unnecessary.

At bottom, while North Carolina's Mental Health Provisions, enacted in 1995, may have been relevant before NICS (1998) and its 2007 amendments, they are outdated and unhelpful now, serving only as a prophylaxis upon prophylaxis, and allowing significant delay in the permitting process (*i.e.*, permitting the infringement of Second Amendment rights).

      **2.**      **Defendants' Idiosyncratic Actions are *Per Se* Unconstitutional Under *Bruen*.**

Defendant McFadden's abuse of the permitting statute is an extreme outlier among North Carolina's sheriffs, designed and utilized to frustrate Mecklenburg County

residents' right to keep and bear arms. By submitting a mental health records request to the Department of Veterans Affairs for *everyone* who applies for a CHP – notwithstanding that most applicants have never served in the military[4] and thus would have no records – Sheriff McFadden has brought to light (and then thoroughly abused) the unbridled discretion inherent in North Carolina's permitting statute. No other North Carolina sheriff abuses the statutory scheme in this manner, and no other North Carolina sheriff creates the absurd permitting delays that Mecklenburg County residents are forced to endure.

Conveniently, the Supreme Court has foretold of abuses such as Defendant McFadden's and has anticipated challenges such as the one brought in this case. Indeed, the Court's recent *Bruen* decision directly controls this matter. Writing for a decisive 6-3 majority, Justice Thomas specifically contemplated circumstances in which even presumptive shall-issue permitting schemes would nevertheless violate the right to keep and bear arms: "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, *lengthy wait times in processing license applications* or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9 (emphasis added). It is this abuse that Plaintiffs challenge. Although Defendants "apologize for the inconvenience" of long application wait times, Compl. ¶ 44, the Second Amendment does not contain an

---

[4] In fact, Defendants submit mental health requests to the VA despite an applicant's statement on the permit application that he has never served in the military. *See* Exhibit X, Mecklenburg County Concealed Handgun Permit Application.

"inconvenience" exception to its "unqualified command" that the rights it protects "shall not be infringed." *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). Plaintiffs submit that the challenged provisions and actions are *per se* Second Amendment infringements, under *Bruen*, without any further analysis necessary under the framework established by *Bruen*. Nevertheless, that analysis follows.

   **3.     The Challenged Statute and Acts by Defendants Are Unconstitutional Under the *Bruen* Framework.**

   Under the test for Second Amendment challenges established by *District of Columbia v. Heller*, 554 U.S. 570 (2008), and reiterated in *Bruen*, Defendants must justify their months-long and year-long deprivations of Plaintiffs' rights to keep and bear arms by pointing to a Founding-era tradition of analogous regulation that evinces widespread acceptance of such practices. *See Bruen*, 142 S. Ct. at 2126. Under the test established in *Bruen*:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." [*Id.* (quoting *Konigsberg*, 366 U.S. at 50 n.10).]

   Plaintiffs easily satisfy the plain text showing required to create an overwhelming presumption of constitutional protection in their favor, and to shift the burden to Defendants to show a wide historical tradition justifying the challenged statute and activities. Indeed, much like the plaintiffs in *Bruen*, Plaintiffs are "ordinary, law-abiding citizens" who "are part of 'the people' whom the Second Amendment protects." *Bruen*,

142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 580); *see* Compl. ¶¶ 7–12. The permits at issue concern handguns, which no party – and no court – can dispute "are weapons 'in common use' today for self-defense," which receive constitutional protection as a categorical matter. *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627). Finally, the permits Plaintiffs seek plainly implicate their rights to acquire, possess, and carry protected handguns, including for self-defense. *See Heller*, 554 U.S. at 582 ("[T]he most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"); *Bruen*, 142 S. Ct. at 2134 ("Th[e] definition of 'bear' naturally encompasses public carry.").

With the textual analysis already performed by the *Heller* and *Bruen* majorities, Defendants bear the heavy burden of justifying their delay tactics with Founding-era historical support:

> Strictly speaking, [Defendants are] bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. . . . [W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. [*Bruen*, 142 S. Ct. at 2137.]

In this case, Defendants' burden is insurmountable.

As *Bruen* makes clear, one or two historical "outliers" will not suffice; rather, Defendants must evince a broad tradition of direct or analogous regulation. *See, e.g.*, *id.* (citation omitted) ("[W]e recognize that 'where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision.'"). Additionally, setting outer bounds to the scope of this historical analysis, the Court in *Bruen* cabined

review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and perhaps the Fourteenth Amendment (but noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). *See Bruen* at 2135-2156 (discussing the lack of relevant historical prohibitions on concealed carry in public).

In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "arm," then the ability to do so "shall not be infringed." Period. There are no "ifs, ands or buts," and it does not matter (even a little bit) how important, significant, compelling, or overriding the government's justification for or interest in infringing the right. It does not matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791, and, perhaps, during ratification of the Fourteenth Amendment in 1868. *Bruen* at 2138.

While Plaintiffs are under no obligation under the *Heller-Bruen* test to perform Defendants' historical analysis for them, undersigned counsel have been unable to locate any Founding-era support for delaying the lawful acquisition, possession, and carrying of common firearms for months (much less over a year) on end. Indeed, the requirement of licensure for concealed firearms did not even begin until the late 1880s – well after ratification of the Fourteenth Amendment and nearly a century after the Second Amendment. *See Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 201944, *129 (N.D.N.Y. Nov. 7, 2022) (collecting pre-1900 city ordinances and quoting *Bruen* for the conclusion that "the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry."). Prior to these irrelevant, post-Reconstruction historical examples, individuals seeking to conceal a firearm (or in North Carolina, even their ability to purchase a firearm) were never required to seek government preclearance to do so. Because of this inescapable reality, Plaintiffs submit that Defendants cannot meet their heavy burden to justify the unconstitutional statute and their unconstitutional actions by resort to historical examples. Consequently, Plaintiffs are likely to succeed on the merits of their Second Amendment challenge and related 42 U.S.C. § 1983 claim.

**B. Plaintiffs Will Continue to Suffer Irreparable Harm Absent Injunctive Relief.**

It is axiomatic that "the denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). In fact, even "a likely constitutional violation" will

satisfy the irreparable harm factor, because "[i]t has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (citation omitted); *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, the past, present, and future constitutional harm to Plaintiffs could not be clearer, as Defendants have concocted a scheme to entirely deny Second Amendment rights within their jurisdiction for periods exceeding an entire year. *See* Compl. ¶¶ 7–12. This has deprived Plaintiffs their ability to bear arms in public for self-defense, a right clearly protected by the Second Amendment, as explained by *Bruen*. Moreover, for those persons such as Plaintiff Williams who does not currently possess a handgun and cannot acquire one without a permit issued by Defendants,[5] Defendants have infringed even the most basic ability to acquire a handgun to keep in the home, the "quintessential self-defense weapon." *Heller* at 629; Compl. at ¶ 7.

Furthermore, Defendant McFadden's concocted permitting process, which involves searching for mental health records by way of a fishing expedition, greatly delays and thus outright denies applicants, including Plaintiffs, their ability to exercise enumerated rights. The nature of Defendants' mental health fishing expedition is on full display in that Defendant McFadden has chosen to request mental health records for applicants from multiple state and federal entities, even without any evidence that the

---

[5] North Carolina law requires a person to obtain either a pistol purchase permit ("PPP") or a CHP prior to purchasing a handgun. N.C.G.S. § 14-402.

applicant has ever been treated or seen by said entities – including Veterans Affairs for applicants who have never even served in the military.

The Supreme Court's *Bruen* decision conclusively establishes that "lengthy wait times" in receiving a permit to carry a firearm amounts to a *per se* Second Amendment infringement. Defendants' concocted scheme thus denies not only that right to *carry* a firearm in public but also the ability to *acquire* a handgun at all. A right delayed is a right denied and, by any reasonable standard, waiting more than a year in order to exercise an enumerated constitutional right is an infringement of Second Amendment rights which "shall not be infringed," the loss of which is clearly an irreparable harm.[6]

### C. Legal Remedies are Inadequate to Relieve the Constitutional Infringement.

The law has no adequate remedy through  money damages, to redress protected Second Amendment violations by government officials. The infringement of constitutional rights is frequently considered to be beyond quantification with money damages. This includes infringements of Second Amendment rights. See *Ezell*, 651 F.3d at 699; See also, e.g., *Legend Night Club*, 637 F.3d at 302; *Lux v. Judd*, 842 F.Supp.2d 895, 904 (E.D.Va 2012) (First Amendment free association rights). No legal remedies are

---

[6] For the sake of clarity, although not at issue in this case, Plaintiffs *do not* concede that even a greatly shortened "wait time" to obtain a permit would be constitutional.  Indeed, there is no historical tradition during the Founding Era requiring a permit at all, in order to keep or bear arms. *See Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 182965, *27 (N.D.N.Y. Oct. 6, 2022) ("just as lacking, it appears, are historical analogues requiring a responsible, law-abiding citizen to even *apply* to be able to carry a gun."). Nor would such a permit be constitutionally permissible in the context of other constitutional right. *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002) (rejecting a requirement of a permit before engaging in door-to-door advocacy protected by the First Amendment).

available to insure the delay of permits will be ended in Mecklenburg County, N.C. or whether such delay will be ended statewide. Obviously, no legal remedies will suffice to compensate those able to self-defense if killed or injured for the inability to lawfully possess defensive arms, owing to the Sheriff's delay.

### D. The Balance of Equities Tips in Plaintiffs' Favor.

Without injunctive relief, Plaintiffs face greater harm than would Defendants if an injunction issued, because Plaintiff Williams cannot even acquire (much less carry) her first handgun without first obtaining a CHP, and Plaintiffs Kane and Yepko's permits are expired pending renewal, leading to loss of Second Amendment rights both within and outside North Carolina. These constitutional harms are real, ongoing, significant, irreparable, and shared by countless other law-abiding gun owners and would-be gun owners within Mecklenburg County.

On the other hand, were the Court to grant the requested relief, Defendants would merely be prohibited from imposing significant delays in permitting and using North Carolina's outdated Mental Health Provisions as a scheme to thwart the exercise of Second Amendment rights. Even without the state's mental health statutory provisions, the NICS system is designed to weed out prohibited possessors of firearms, including on the basis of mental health. In other words, absent Defendants' unconstitutional delays in the permitting process, there is no reason to believe that any prohibited person would acquire a CHP.

Finally, Fourth Circuit "precedent counsels that 'a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions

likely to be found unconstitutional. If anything, the system is improved by such an injunction.'" *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (quoting *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013)). Plaintiffs on the other hand, when delayed in obtaining a government-required license to exercise constitutional rights, are exposed to all of the risks of harm which threaten them and cause them to desire to carry a handgun for self-defense in the first place. It is more than speculative that, for someone whose rights have been infringed by Sheriff McFadden's actions, the inability to acquire a permit and to carry a firearm in public for self-defense quite literally could mean the difference between life and death.

### E.  An Injunction Is in the Public Interest.

"Finally, it is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. Importantly, Defendants cannot commandeer this *Winter* factor to demand a governmental interest-balancing test that has already been categorically rejected by the U.S. Supreme Court. *See Bruen*, 142 S. Ct. at 2133 n.7 ("[T]he Second Amendment is the 'product of an interest balancing *by the people*,' not the evolving product of federal judges." (quoting *Heller*, 554 U.S. at 635)); *see also id.* at 2127. As Justice Thomas explained, "the Second Amendment does not permit—let alone require—'judges to assess the costs and benefits of firearms restrictions' under means-end scrutiny." *Bruen*, at *27.

Additionally, Plaintiffs (and their members and supporters) are not the only parties who will benefit from a preliminary injunction—every member of the public in Mecklenburg County who seeks a CHP will benefit from the timely issuance of CHPs,

enabling them to exercise constitutionally protected rights without undue delay.[7]  The relief requested herein does not require Defendants to issue any permit, or to issue one to a prohibited possessor of firearms, but merely to issue or deny permits timely, within the statutorily prescribed 45-day window.  The public interest thus is entirely one-sided in this case and favors Plaintiffs.

## IV.  Conclusion.

"The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen* at 2156 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)). Yet the American public would balk at exorbitant licensing delays in any other constitutional context, such as waiting a year to obtain a government permit to hold church services, or a license to post a Tweet. Indeed, the Supreme Court has been unequivocal: concealed carry licensing schemes cannot "be put toward abusive ends," and qualified license applicants *must* be issued such licenses in a timely manner without "lengthy wait times." *Id.* at 2138 n.9. Any deviation from this "unqualified command" infringes the people's rights to possess and carry lawful arms and demands swift relief that will vindicate those rights. *Id.* at 2126 (citing *Konigsberg*, 366 U.S. at 50 n.10).

---

[7] Although Fed. R. Civ. P. 65(c) requires that a bond or other security be provided as a condition of issuing preliminary injunctions, this requirement may be dispensed with when there is no risk of financial harm. *Federal Prescription Serv. v. American Pharmaceutical Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980); *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Even courts that view Rule 65(c) as mandatory are open to the idea of the bond being set at zero. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). Given the nature of this case, the Court should dispense with the bond requirement.

For the foregoing reasons, the Court should issue an order preliminarily and permanently enjoining the challenged provisions of North Carolina's law and Defendant McFadden's abuse of the Mental Health Provisions.

Respectfully Submitted,

December 12, 2022

/s/ Robert Neal Hunter, Jr.
Robert Neal Hunter, Jr.  (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone: (336) 273-1600
Facsimile: (336) 274-4650
Email:  rnhunterjr@greensborolaw.com

Ronald J. Shook, II  (NCSB 43407)
THE LAW OFFICES OF RONALD J. SHOOK
121 E. Main Ave.
Gastonia, NC 28012
Telephone: 704-671-2390
Facsimile:  704-671-4431
Email:  ron@rjshooklaw.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this date, December 12, 2022, I caused the foregoing document to be filed and served on all counsel of record by operation of CM/ECF system for the United States District Court for the Western District of North Carolina.

*/s/ Robert Neal Hunter, Jr.*
Robert Neal Hunter, Jr.  (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone:    (336) 273-1600
Facsimile:    (336) 274-4650
Email:         rnhunterjr@greensborolaw.com

Ronald J. Shook, II  (NCSB 43407)
THE LAW OFFICES OF RONALD J. SHOOK
121 E. Main Ave.
Gastonia, NC 28012
Telephone:    704-671-2390
Facsimile:    704-671-4431
Email:         ron@rjshooklaw.com

*Attorneys for Plaintiffs*