IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:22-cv-630-MOC-DSC

| | |
|---|---|
| SARA BETH WILLIAMS, BRUCE KANE, JASON YEPKO, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, GRASS ROOTS NORTH CAROLINA, and RIGHTS WATCH INTERNATIONAL, <br><br>Plaintiffs, <br><br>v. <br><br>SHERIFF GARRY MCFADDEN, in his official capacity as Sheriff of Mecklenburg County, and the MECKLENBURG COUNTY SHERIFF'S OFFICE <br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## DEFENDANTS' RESPONSE TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Despite repeatedly acknowledging that Defendants are operating within the statutory framework for administering Concealed Handgun Permits ("CHP"s) set forth in N.C.G.S. §§ 14-415.12, -.13, and -.15, Plaintiffs seek to enjoin Defendants from following these statutes as written, requesting that this Court order Defendants to ignore the plain language of these statutes and instead follow them as if written

1

the way the gun lobby wishes they were. This Court should reject Plaintiffs' suggestion that it act as a super-legislature, and deny Plaintiffs' motion.

## I. INTRODUCTION

The seven Plaintiffs are three individuals: 1) Sara Beth Williams ("Williams"); 2) Bruce Kane ("Kane"); and 3) Jason Yepko ("Yepko") (collectively the "Applicants"); and four organizations: 1) Gun Owners of America, Inc. ("GOA"); 2) Gun Owners Foundation ("GOF"); 3) Grass Roots North Carolina ("GRNC"); and 4) Rights Watch International ("RWI") (collectively the "Organizations"). [ECF No. 1.] The Organizations exist "to preserve and defend the Second Amendment rights of gun owners." [ECF No. 1-1 and 1-2.] GOA and GOF admit that they "routinely litigate cases across the country in furtherance of their mission, on behalf of their members and supporters in various states." [ECF No. 1-1.] GRNC, for instance, "is dedicated to electing legislators who will defend your gun rights, and passing legislation for the same. In local battles, we pressure city councils and county commissions to respect the gun rights of residents. On occasion, we use political pressure to target elected officials who, through malfeasance, have denied due process to individuals."[1]

Plaintiffs' Complaint for declaratory and injunctive relief asserts various constitutional challenges to Mecklenburg County Sheriff Garry McFadden's and the

---
[1] https://www.grnc.org/resources/faqs-about-nc-gun-laws

Mecklenburg County Sheriff's Office ("MCSO")'s CHP permitting process. [ECF No. 1]. Sheriff McFadden, like all North Carolina sheriffs, is responsible for administering the gun permitting process, including applications for CHPs. *See* N.C.G.S. §§ 14-402- 415.27. Plaintiffs have pled the following causes of action against both Defendants:

Count I: Violation of the Second Amendment [ECF No. 1, ¶¶ 96-103];

Count II: Violation of 42 U.S.C. § 1983, Second Amendment, *id.* at ¶¶ 104-109;

Count III: Violation of 42. U.S.C. § 1983, Fourteenth Amendment Due Process, *id.* at ¶¶ 110-116; and

Count IV: Violation of 42. U.S.C. § 1983, Fourteenth Amendment Equal Protection, *id.* at ¶¶ 117-126.

Plaintiffs' motion for a preliminary injunction should be denied because 1) Defendants are complying with N.C.G.S. §§ 14-415.12, -.13, and -.15; 2) Plaintiffs have not shown any irreparable harm; 3) the balance of equities favors Defendants; and 4) an injunction is not in the public interest.

## II. STATEMENT OF FACTS

Any person with a CHP may carry a concealed handgun. N.C.G.S. § 14-415.11. North Carolina is a "shall issue" state, meaning that Defendants do not have discretion to deny a CHP if the CHP applicant meets certain criteria. N.C.G.S. § 14-

415.12. An applicant must submit an application[2], a nonrefundable permit fee of $90.00, a fee of $10.00 for fingerprinting (and submit to fingerprinting by the Sheriff), a certificate of completion of an approved course for handgun competency, and a release authorizing disclosure of any records concerning the "mental health or capacity"[3] of the applicant to determine whether s/he is disqualified from receiving a permit under N.C.G.S. § 14-415.12(a)(3). N.C.G.S. § 14-415.13(a)(5).

After the applicant completes the items in N.C.G.S § 14-415.13, the Sheriff is authorized to "conduct *any investigation necessary* to determine the qualification or competency of the person applying for the permit." N.C.G.S. § 14-415.15(a) (emphasis added). Within ten days of the receipt of the items listed in N.C.G.S. § 14-415.13, the "sheriff *shall* make the request for any records concerning the mental health or capacity of the applicant." N.C.G.S. § 14-415.15(a) (emphasis added). N.C.G.S. § 14-415.15(a) further provides that "within 45 days of the receipt of the items listed in G.S. 14-415.13 from an applicant, and receipt of the required records concerning the mental health or capacity of the applicant, the sheriff shall either issue or deny the permit." N.C.G.S. § 14-415.15(a). Within ten days of receiving a completed CHP application, Defendants send the applicant's mental health releases to the seven providers where Mecklenburg County residents are most likely to have

---

[2] This application is created by the North Carolina State Bureau of Investigation ("SBI"), and is attached as Exhibit 1A to the Declaration of Tamara Rhode.
[3] *See* North Carolina Administrative Office of the Courts form AOC-SP-914, which is attached as Exhibit 1B to the Declaration of Tamara Rhode.

4

received treatment for mental health issues, including the U.S. Department of Veteran's Affairs (the "VA") which operates multiple facilities in North Carolina for the treatment of military veterans. (Rhode Dec. ¶¶ 7-8).[4] Once Defendants request an applicant's mental health records, control of the process shifts to the mental health providers while Defendants await production of the records. (Rhode Dec. ¶ 10). The Sheriff cannot control how long it may take any given mental health provider to return the requested records, but so long as the Sheriff issues or denies the CHP within forty-five days of receiving those records, the Sheriff is in compliance with the law.

Plaintiffs allege that the Mental Health Provisions ("MHP") are unconstitutional [ECF No. 1, p. 2][5] and Defendants' request for mental health records pursuant to N.C.G.S. §§ 14-415.12 causes an unnecessary and long delay for CHP applicants which constitutes an infringement on Plaintiffs' Second Amendment rights. [ECF No. 1.] However, in their argument, Plaintiffs ignore several important points: 1) Defendants are not the proper parties against whom to bring a constitutional challenge; 2) N.C.G.S. § 14-415.12 demands a finding by Sheriff McFadden, and all North Carolina Sheriffs, that an "applicant does not suffer from a physical or mental infirmity that prevents the safe handling of a handgun"; and 3)

---

[4] "Rhode Dec." refers to the Declaration of Tamara Rhode, attached as Exhibit 1 to this Response.
[5] Plaintiffs define MHP as "certain portions of N.C.G.S. § 14-415.13 through N.C.G.S. § 14-415.15," but do not specify which portions are unconstitutional. [ECF No. 1, p. 2].

5

the Sheriff is authorized to "conduct any investigation necessary to determine the qualification or competency of the person applying for the permit." N.C.G.S. § 14-415.15(a). Plaintiffs' motion for emergency relief should therefore be denied.

## III. ARGUMENT

Plaintiffs seeking a preliminary injunction must establish a) that they are likely to succeed on the merits, b) that they are likely to suffer irreparable harm in the absence of preliminary relief, c) that the balance of equities tips in their favor, and d) that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008). The purpose of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits. *Stinnie v. Holcomb*, 37 F.4th 977, 983 (4th Cir. 2022) (cleaned up).

### A. PLAINTIFFS WILL NOT SUCCEED ON THE MERITS

In order to prevail on the merits, Plaintiffs must show that Defendants 1) deprived them of a right secured by the Constitution and laws of the United States; and 2) that the deprivation was under the color of state law. *Phillips v. Pitt County Memorial Hospital,* 572 F.3d, 176, 180 (4th Cir. 2009). For purposes of this motion, Defendants acknowledge that they were acting under color of law in complying with N.C.G.S. §§ 14-14-414.12 *et seq.* The only remaining issue is whether Plaintiffs can

6

show that Defendants' compliance with these statutes violated their Constitutional rights. It is clear that they cannot.

### 1. PLAINTIFFS DO NOT ALLEGE ANY STATUTORY VIOLATIONS

Plaintiffs make various claims about the constitutionality of the MHP, but they fail to allege that Defendants are violating any statutes. They do not allege that Defendants have 1) violated the ten-day deadline for submitting requests for mental health records; or 2) violated the forty-five-day deadline related to issuance of a permits after all mental health records are received. Instead, they argue 1) that the time-frames set forth in the statutes should be interpreted differently than written; 2) that the information in the mental health records is duplicative of other information that Defendants are authorized to review by other means; and 3) that Defendants cannot legally request VA records when the applicant asserts that s/he has never served in the military. None of these arguments have any merit.

Plaintiffs have misinterpreted N.C.G.S. § 14-415(a) which clearly states that "*within 45 days* after receipt of the items listed in GS 14-415.13 from an applicant, *and receipt of the required records concerning the mental health or capacity of the applicant*, the sheriff shall either issue or deny the permit." (emphasis added). In fact, the most striking flaw in Plaintiffs' logic is the contention that once an applicant completes the CHP application, that applicant should have a decision on his or her permit within forty-five days. Plaintiffs seek to rewrite the law completely by asking

7

WBD (US) 60184825v1
Case 3:22-cv-00630-MOC-DSC   Document 14   Filed 01/10/23   Page 7 of 19

that Defendants be enjoined "from withholding handgun permits for qualified applicants to be issued under N.C.G. Stat. §§ 14-415, 15(a) for more than 45 days after an application has been submitted." [ECF 9, pp. 1-2]. To suggest that Defendants must issue or deny a CHP within forty-five days of receiving an application misstates the law. The forty-five-day period starts to run upon completion of a CHP application *and* "receipt of the required records concerning the mental health or capacity of the applicant." N.C.G.S. § 14-415.15(a).

Plaintiffs use such terms as "abus[ive]," "devious," "Byzantine," "unbridled," and suggest a "fishing expedition" to describe Defendants' efforts that allegedly create unreasonable delays. But those terms – indeed those arguments – are only potentially germane to an inquiry regarding the constitutionality of the statute itself. If Plaintiffs wish to challenge N.C.G.S. § 14-415.15(a), the proper respondent to such a challenge would be the North Carolina Attorney General.[6] Plaintiffs misdirect their protestations to the "North Carolina Mental Health Provisions" set forth in the N.C.G.S. § 14-415.15(a) by suing the Defendants. Notwithstanding Plaintiffs' obvious frustrations with Sheriff McFadden's lawful (indeed obligatory) exercise of discretion in seeking mental health records from the providers he deems appropriate, Plaintiffs concede that Sheriff McFadden is

---

[6] Attorney General Josh Stein was named as a defendant in the Complaint [ECF No. 1, ¶¶ 15, 109], but Plaintiffs filed a "Joint Stipulation to remove Attorney General Josh Stein as a named Defendant" on January 6, 2023. [ECF 13].

operating in compliance with N.C.G.S. § 14-415.15(a). Plaintiffs have not alleged that Defendants have violated the CHP statute. Plaintiffs complain that the mental health background checks Defendants perform on Mecklenburg County citizens who wish to conceal their firearms in public places are "prophylaxis on prophylaxis." [ECF No. 10, p. 10] In essence, Plaintiffs contend that there is no point to requesting mental health records beyond what is provided by the Federal Bureau of Investigations National Instant Criminal Background Check System ("NICS"). But again, Plaintiffs' argument is based upon a misreading of the relevant statutes.

Defendants utilize the NICS system to review an applicant's criminal history. (Rhode Dec. ¶¶ 4-5). However, as Plaintiffs recognize, as far as mental health issues are concerned, NICS only provides information regarding mental health *adjudications*. [ECF No. 10, p. 11]; (Rhode Dec. ¶ 5). Defendants' NICS inquiry is partially relevant to the mandate in N.C.G.S. § 14-415.12 (b) (6) which states that a Sheriff shall deny a permit to someone who "is currently, or has been previously adjudicated by a court or administratively determined by a government agency whose decisions are subject to judicial review to be, lacking mental capacity or mentally ill." However, Plaintiffs ignore that North Carolina Sheriffs are also required to determine that an "applicant does not suffer from a physical or mental infirmity that prevents the safe handling of a handgun." N.C.G.S. § 14-415.12(a)(3).

9

An applicant never adjudicated mentally ill might still have visited a mental health facility for any number of reasons, and information from such a visit or visits may lead a Sheriff to conclude that the applicant suffers "from a physical or mental infirmity that prevents the safe handling of a handgun." *See e.g., Cale v. Atkinson*, 268 N.C. App. 466 at *4, 834 S.E.2d. 454 (table) (2019) (upholding Sheriff's denial of permit based upon applicant suffering from "physical or mental infirmity" based upon mental health records from twenty years earlier). The reason Defendants seek information from Mecklenburg County CHP applicants' most commonly accessed mental health providers is not because Defendants are "anti-gun" as Plaintiffs suggest; it is because Defendants are complying with the mandate set by the North Carolina General Assembly: that individuals authorized to carry a concealed handgun do not suffer from a "physical or mental infirmity" that prevents the safe handling of that handgun.

Plaintiffs contend there is no point in requesting records from the VA for individuals who claim they never served in the military. While Defendants inquire of all CHP applicants whether they have served in the military, an important reason justifies Defendants' request for VA records notwithstanding a negative reply about military service. Some applicants inaccurately or mistakenly (if not untruthfully) answer the question about military service. (Rhode Dec. ¶ 9). For example, a recent applicant indicated that he had never served in the military, but

10

VA records showed that not only had the applicant served (and thereby qualified for treatment at the VA), he had also attempted suicide on multiple occasions and threatened physically to harm VA employees at a VA facility. *Id*.

Other applicants may answer this question truthfully and still, perhaps unintentionally, provide a misleading answer. The applicant only has to answer under oath whether they "[h]ave…been discharged from the U.S. Armed Forces under conditions other than honorable." (Rhode Dec. ¶ 2, Exhibit 1A). An applicant who served in the military but was honorably discharged would answer this question "no." The same applicant, however, may well have received treatment from the VA.

N.C.G.S. § 14-415.15(a) states that "the sheriff may conduct any investigation necessary to determine the qualification or competency of the person applying for the permit, including record checks." Given the reality – that CHP applicants may incorrectly (intentionally or otherwise) indicate never having served in the military, or that they may not have "been discharged…under conditions other than honorable" – Defendants' request for VA mental health records for all CHP applicants is certainly reasonable.

### 2. *BRUEN* IS DISTINGUISHABLE

Suggesting that Defendants' request for mental health records creates an unconstitutional delay, Plaintiffs repeatedly reference the last sentence in a footnote

in the recent Supreme Court decision that struck down New York State's "proper cause" statute for concealed carry permits. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). In the first sentence of the footnote, the Supreme Court made it clear that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall- issue" licensing schemes…." *Id*. at 2138 n. 9. The final sentence of that footnote upon which Plaintiffs contend controls this case suggests that " … because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id* But Plaintiffs ignore the distinction between "public carry," "open carry," and "concealed carry." Public carry refers to the notion of possessing a handgun in a public place. Public carry is simply an umbrella term under which open carry and concealed carry both fall. The last sentence in footnote 9 in *Bruen* only cautions against extreme delays and exorbitant fees that could, in effect, place an unconstitutional burden on public carry. But according to *Bruen*, as no permit is required for open carry in North Carolina, Plaintiffs Second Amendment right to public carry is not infringed by N.C. G.S. § 14-415.15(a).

CHP applicants' Second Amendment rights are not infringed upon by Defendants' lawful enforcement of N.C.G.S. § 14-415.15(a). Defendants do not

endeavor to ban concealed carry. Moreover, Plaintiffs do not raise a "may issue" or "proper cause" question as was considered in *Bruen*. Sheriff McFadden has ten days to request mental health records upon completion on an application, and forty-five days to make a decision once those records are returned. CHP applicants denied a permit may challenge the reasonableness of the Sheriff's decision by appeal to the state District Court. Sheriff McFadden's only discretion in the CHP process concerns what mental records to request, in order to determine whether the applicant suffers from a physical or mental infirmity which prevents him or her from safely handling a handgun. N.C.G.S. § 14-415.12(a)(3). *Bruen* does not stand for the proposition that any delay in obtaining a CHP is unconstitutional; certainly not a "delay" caused by the time it may take a mental health provider to produce its records, a delay which is completely out of the Sheriff's control.

Since *Bruen*, one district court in New York held that *Bruen's* "lengthy wait times" dicta in footnote 9 might apply in a situation where an applicant cannot obtain an available appointment in order to submit an application for over a year. *See Antonyuk v. Hochul*, -- F. Supp.3d --, 2022 WL 16744700 at * 11 (N.D.N.Y. 2022) (noting that failure to process a gun permit application due to lack of available appointments for more than a year may violate applicant's Second Amendment rights.) The individual Plaintiffs in this case have all had their CHP applications approved. (Rhode Dec. ¶¶ 14-16). Any delay they had in receiving their CHPs does

not implicate footnote 9 in *Bruen*. As Justice Kavanaugh stated in his concurrence in *Bruen*: "shall-issue regimes" that "do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense" are "constitutionally permissible," even if they require an individual to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." 142 S.Ct. at 2162 (Kavanaugh, J., concurring).

### 3. DEFENDANTS HAVE IMMUNITY FOR ANY CIVIL LIABILITY AS A RESULT OF THEIR PERFORMANCE OF CHP PROCESSING DUTIES

The North Carolina General Assembly has declared that "[a] sheriff who issues or refuses to issue a permit to carry a concealed handgun under this Article shall not incur any civil or criminal liability as the result of the performance of the sheriff's duties under this Article." N.C.G.S. § 14-415.20. The plain language of this statute is a prohibition on Plaintiffs' ability to bring a civil proceeding against Defendants for allegations that they are unlawfully delaying the issuance of permits. This immunity is in addition to a sheriff's sovereign immunity for discretionary acts in general. N.C.G.S. § 14-415.20 is a clear expression of the legislative intent to free a sheriff from litigation such as this, as well as claims that might arise from the sheriff's administration of the concealed carry permit laws.

## B. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM

Plaintiffs maintain that without a judicial fiat granting them the right to carry concealed handguns in North Carolina, they will suffer irreparable harm. However, a North Carolina citizen may legally purchase a handgun by obtaining a Pistol Purchase Permit ("PPP") through a process which is also administered by all North Carolina Sheriffs and prescribed by separate statute (N.C.G.S. § 14-404). Sheriffs are not required to conduct the same mental health background checks for a PPP as they are for a CHP, as a PPP allows only for the purchase of a handgun, and does not authorize a permit holder to carry a concealed weapon in a public area. *Id*. Accordingly, in issuing a PPP, Sheriffs do not affirm that the "applicant does not suffer from a physical or mental infirmity that prevents the safe handling of a handgun," as is required for a CHP pursuant to N.C.G.S. § 14-415.12(a)(3). "North Carolina citizens who lawfully obtain a handgun via a PPP can still "open carry" it in public, as North Carolina does not require any permit for open carry. *State v. Mathis*, 274 N.C. App. 250, 849 S.E.2d 369, 369 (2020).

Applicants' "irreparable harm" argument is also undermined because Williams and Yepko's CHP applications have been approved, and their permits were received from the SBI on December 5, 2022. (Rhode Dec. ¶¶ 14, 16). Kane's CHP application was approved on January 6, 2023, and MCSO will notify him when the SBI prints his permit. *Id*. at ¶ 15.

15

In addition, N.C.G.S. § 14-415.15(b) offers an expedited path to a temporary CHP for citizens who have a demonstrable safety concern constituting an "emergency situation." This provision allows the Sheriff to issue a temporary CHP prior to obtaining the applicant's mental health records. Applicants claim they need emergency relief, but there is no evidence that any of the Applicants even attempted to utilize the emergency relief offered in N.C.G.S. § 14-415.15(b). So the argument that "no legal remedies will suffice to compensate those able to self-defense if killed or injured for the inability to lawfully possess defensive arms" [ECF No. 10 at 20] is as erroneous as it is hysterical and inflammatory. Applicants can obtain firearms to defend themselves, and can carry them in public without a CHP.

To suggest that they face irreparable harm without an injunction, Plaintiffs allege that any individual who possesses a handgun and a CHP will survive a public altercation, but without one they will not. This speculative argument is obviously flawed. There is, of course, no guarantee that citizens with a handgun and a CHP will be able to defend themselves when put in a high-stress, life-threating situation that justifies the use of deadly force. Plaintiffs posit that all citizens who apply for a CHP possess the natural ability to shoot an assailant and avoid injuring (or worse) innocent bystanders. Putting aside the sheer fantasy of the scenario, what role does concealment play in it? North Carolina citizens can openly carry firearms without a CHP.

As such, Plaintiffs cannot show that the lawful delay in the issuance of a CHP will cause them irreparable harm.

C.  **THE BALANCE OF EQUITIES FAVORS DEFENDANTS**

Plaintiffs recycle the same "life and death" argument when discussing the balance of equities. But their argument is even less compelling in this context. The competing interests are the time it takes for qualified applicants to obtain a CHP – applicants who can already carry a weapon openly because there is no permit required for open carry – versus Defendants' obligation to comply with the directive of the General Assembly to insure that individuals seeking a CHP do not suffer from physical or mental infirmities that prevent the safe handling of a handgun.

First, Plaintiffs are seeking to change the status quo, which in and of itself means that the balance of equities is not in their favor. Second, the notion that the desire of an individual who may suffer from mental illness to conceal a handgun in public is somehow more vital than first ensuring the ability of that individual safely to handle that handgun, offends all notions of logic and reason. The balance of equities clearly favors Defendants.

D.  **PUBLIC INTEREST FAVORS DENIAL OF THE INJUNCTION**

While the balance of equities favors denial of a preliminary injunction, public interest demands it. Plaintiffs concede that this litigation is part of a larger agenda to eliminate restrictions on gun ownership in the United States. They frequently find

17

opportunities in their memorandum to editorialize on issues not before the Court: "[f]or the sake of clarity, and although not at issue in this case, Plaintiffs *do not* concede that even a greatly shortened 'wait time' to obtain a permit would be constitutional." [ECF No. 10 at 19, Footnote 6] (emphasis in original). But the proper avenue to pursue this agenda is must do so through the legislative process, not the judicial system the public is entitled to protection from handguns being concealed by individuals who have mental or physical infirmities that would prohibit the safe handling of such dangerous weapons. Handguns concealed by citizens who cannot safely handle them creates a clear and present danger to the community. Furthermore, Plaintiffs do not allege that Defendants have missed the ten-day or forty-five-day deadlines, and the public interest as evidenced by the obvious intent of the CHP statute requires Defendants continue to carry out the directives of that statute unless and until the statute is amended or struck down as unconstitutional.

## IV. CONCLUSION

Plaintiffs are pushing an activist agenda to strike down North Carolina's CHP statutes as unconstitutional. Defendants, however, have no place in the middle of such a constitutional challenge and no legal standing to defend it. Defendants have properly exercised their authority as required by statute. Plaintiffs can show neither likelihood of success on the merits, irreparable harm, the balance of equities in their favor, nor that granting their requested injunction is in the

18
WBD (US) 60184825v1
Case 3:22-cv-00630-MOC-DSC   Document 14   Filed 01/10/23   Page 18 of 19

public interest. For the foregoing reasons Plaintiffs Motion for Preliminary Injunction should be denied.

Respectfully submitted this 10th day of January, 2023.

/s/*Sean F. Perrin*
Sean F. Perrin
N.C. State Bar No. 22253
Alexander J. Buckley
N.C. State Bar No. 53403
WOMBLE BOND DICKINSON (US) LLP
301 South College Street, Suite 3500
Charlotte, North Carolina 28202-6037
Telephone: 704-331-4992
Facsimile: 704-338-7814
Sean.Perrin@wbd-us.com
Alex.Buckley@wbd-us.com


/s/*J. George Guise*
J. George Guise
N.C. State Bar No. 22090
Mecklenburg County Sheriff's Office
801 East Fourth St.
Charlotte, North Carolina 28202

*Attorneys for Defendants Sheriff Garry McFadden and Mecklenburg County Sheriff's Office*