IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:22-cv-630-MOC-DSC

| | |
|---|---|
| SARA BETH WILLIAMS, BRUCE KANE, JASON YEPKO, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, GRASS ROOTS NORTH CAROLINA, and RIGHTS WATCH INTERNATIONAL, <br><br> Plaintiffs, <br><br> v. <br><br> SHERIFF GARRY MCFADDEN, in his official capacity as Sheriff of Mecklenburg County and the MECKLENBURG COUNTY SHERIFF'S OFFICE <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**A. Defendants Fail to Undermine Plaintiffs' Likelihood of Success.**

**1. Statutory Compliance with an Unconstitutional Statute Is No Defense.**

Defendants' main argument in defense of their permitting delays is that they are complying with the statute. *See* Defendants' Response to Plaintiffs' Motion for Preliminary Injunction ("Opp."), ECF #14 at 1 ("operating within the statutory framework"); 3 ("Defendants are complying"); 7 (Plaintiffs "fail to allege that Defendants are violating any statutes"); 9 ("Plaintiffs have not alleged that Defendants have violated

1

the CHP statute"). But Defendants' premise is flawed and thus their argument fails — Plaintiffs have not raised any *statutory* claims, but rather *constitutional* claims under the Second Amendment and 42 U.S.C. § 1983. *See* Opp. 3 (summarizing). Defendants' compliance with an unconstitutional statute is not a defense to the constitutional claims here.

Nevertheless, in support of this contention, Defendants make several unrelated assertions. First, they mischaracterize the relief Plaintiffs seek, accusing Plaintiffs of asking the Court to "rewrite" the statute when, in reality, Plaintiffs merely seek invalidation of its unconstitutional provisions. Second, Defendants claim that they are not the proper parties here even though all relevant precedent says otherwise. Third, Defendants claim that, in addition to running a background check to find mental health disqualifiers, they have an independent statutory duty to adjudge the mental health *bona fides* of CHP applicants.[1] But even if true, all this shows is that the statute is unconstitutional, vesting open-ended discretion in Defendants. For the reasons below, none of Defendants' arguments hold water.

First, Defendants either misunderstand or misconstrue the nature of the relief Plaintiffs seek, claiming that Plaintiffs are asking this Court "to ignore the plain language of these statutes and instead follow them as if written the way the gun lobby wishes they

---

[1] Defendants' claim belies their assertions elsewhere that the statute should be upheld because it represents a "shall issue" licensing scheme. Opp. 3, 12, 14. Although North Carolina is generally considered "shall issue," no informal label governs how a licensing framework is analyzed under *Bruen* and, if North Carolina statutes operate the way Defendants say (giving the sheriff discretion to adjudge the suitability of applicants), then North Carolina is not a "shall issue" regime.

were." Opp. 1–2; *see also* at 7 (claiming Plaintiffs argue statute "should be interpreted differently than written"); 7 (claiming Plaintiffs "misrepresented" statute by arguing that an "applicant should have a decision on his or her permit within forty-five days. Plaintiffs seek to rewrite the law completely...."); 8 (claiming Plaintiffs "misstate the law"). On the contrary, Plaintiffs are not asking the Court to interpret the North Carolina permitting statutes in any particular way, but merely to strike down the unconstitutional portions thereof. Defendants claim the state permitting scheme does not require permits be issued within 45 days (Opp. 7), apparently failing to realize that, without the "open-ended discretion" and indefinite delay caused by the unconstitutional mental health provisions, that is how the statute would operate (as there would be no mechanism for Defendants to delay the process longer than 45 days). Again, Plaintiffs do not ask the Court to "act as a super-legislature" (Opp. 2), but merely to exercise its basic role to "say what the law is" and declare "a law repugnant to the constitution void." *See Marbury v. Madison*, 5 U.S. 137, 177, 180 (1803).

Second, Defendants object to various of Plaintiffs' characterizations of the North Carolina mental health provisions, claiming they are "only potentially germane to an inquiry regarding the constitutionality of the statute itself." Opp. 8. But again, constitutional questions are the only thing Plaintiffs raise here. Nevertheless, Defendants claim that "Defendants are not the proper parties against whom to bring a constitutional challenge," and that "the proper respondent to such a challenge would be the North Carolina Attorney General." Opp. 5, 8. As a preliminary matter, Defendants do not provide any legal authority for this argument or develop it any way, and thus it is waived.

3

*See Salamone v. Cent. Piedmont Cmty. Coll.*, No. 3:18-CV-00298-GCM, 2020 U.S. Dist. LEXIS 23271, at *8 (W.D.N.C. Feb. 11, 2020) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). Regardless, it is black-letter law that a government official is a proper party for suit when a statute gives a specific duty to that official to enforce a particular law. *See, e.g.*, *Nat'l Ass'n for Rational Sexual Offense L. v. Stein*, No. 1:17CV53, 2019 U.S. Dist. LEXIS 126617, at *11 (M.D.N.C. July 30, 2019) (An official's "duties, which included the right and the power to enforce the statutes of the state, sufficiently connected him with the duty of enforcement to make him a proper party to an action challenging a state statute's constitutionality."); *see also Brandon v. Guilford Cnty. Bd. of Elections*, 921 F.3d 194, 199 (4th Cir. 2019) ("Suits seeking injunctions against enforcement entities are the standard means by which laws are challenged on constitutional grounds.").

Indeed, in *Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014), the Fourth Circuit held that a county clerk was the "proper defendant" who "b[ore] the requisite connection to the enforcement of the Virginia Marriage Laws due to his role in granting and denying applications for marriage licenses." A West Virginia district court then applied *Bostic* in a case challenging the constitutionality of a Ballot Order Statute, holding that, as "chair of Kanawha County's ballot commission, which prepares the county's ballots," the defendant's "connection to the enforcement of the [statute] [wa]s indisputable" and she was thus a proper defendant. *Nelson v. Warner*, 446 F. Supp. 3d 119, 125 (S.D. W. Va. 2020). Here, Defendants — as they admit — are explicitly tasked with issuance of permits under the CHP statute. *See* Opp. 3 ("Sheriff McFadden ... is

4

responsible for administering the gun permitting process, including applications for CHPs."). That is more than enough to make Defendants proper parties to challenge the constitutionality of the mental health provisions. *See Wright v. North Carolina*, 787 F.3d 256, 262 (4th Cir. 2015) (proper party where an official has a "special duty to enforce the challenged" law).

Third, Defendants reject Plaintiffs' argument that the mental health provisions are redundant, prophylaxis upon prophylaxis, because any disqualifying mental health records already should be included as part of a NICS federal and North Carolina state background check. ECF #10 at 10; Opp. 9. Rather, Defendants claim "NICS only provides information regarding mental health *adjudications*," and that they additionally are "required to determine that an 'applicant does not suffer from a physical or mental infirmity.'" Opp. 9. *Compare* N.C.G.S. § 14-415.12(a)(3), *with* (b)(6). Defendants claim that they therefore must "exercise ... discretion" as "deem[ed] appropriate" and must "conclude that the applicant" is free of any "physical or mental infirmity that prevents the safe handling of a handgun." Opp. 8, 10; *see also* at 5 (statute "demands a finding by" Defendant about mental health). Putting aside the grave constitutional (not to mention moral) questions with respect to a statute that denies constitutional rights to those who possess full mental capacity but simply have a "*physical*" handicap[2] (*e.g.*, legally blind, missing a limb, or

---

[2] The Supreme Court has never made any such distinction, making clear that the Second Amendment protects a broad right that "belongs to all Americans" and is "**Error! Main Document Only.**unconnected with militia service" (where, arguably, one might need to be able-bodied), and that the phrase "the people" includes all "ordinary, law-abiding, adult citizens…." *Heller* at 581-82; *Bruen* at 2134.

suffering from Parkinson's Disease — *i.e.*, the types of persons often in greatest need of the means with which to defend themselves), any independent discretion given to Defendants to exercise judgment about an applicant's *bona fides* is precisely the sort of prohibited "grant [to] licensing officials [of] discretion to deny licenses based on a perceived lack of need or suitability." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2123 (2022); *see also id.* at 2162 (Kavanaugh, J., concurring) (contrasting "open-ended,"[3] subjective standards such as those Defendants advocate[4] with objective, fixed standards such as "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws"). In other words, if the statute operates the way Defendant claims — providing authority to decide *whether he thinks* applicants are mentally *and physically* suitable to be granted CHPs — then all Defendants have done is to hoist themselves with their own petard, providing yet another reason why the statute is unconstitutional.[5]

---

[3] In fact, Defendants go so far as to acknowledge that the mental health provisions place the CHP permitting process into the hands of non-governmental third parties, since "[o]nce Defendants request an applicant's mental health records, control of the process shifts to the mental health providers." Opp. 5. In other words, the challenged provisions grant "open-ended discretion" not only to Defendants but also to independent third parties, with no statutory requirement that they must ever do anything. Such a statute cannot survive Second Amendment scrutiny.

[4] *See also* Opp. 4 (emphasis added) (claiming that North Carolina law broadly authorizes Defendants to "conduct *any investigation necessary* to determine the qualification" of a CHP applicant").

[5] Defendants relatedly claim that they *must make* numerous mental health requests — including to the Department of Veterans Affairs for those who have never served in the military — because applicants cannot be trusted to tell the truth on their applications, as the only statement "under oath" required of an applicant pertains to how he was discharged. Opp. 10–11. But this point is subsumed within Defendants' broader argument that they have independent discretion to adjudge a person's suitability to obtain a CHP, an argument addressed above.

### 2. Defendants Do Not Even Attempt to Mount a Defense Under *Bruen*.

Defendants claim that *Bruen* (which lays out the framework for all Second Amendment challenges) has no application to this case (a Second Amendment challenge) on the theory that *Bruen*'s footnote nine merely disapproves of delays for "licensing" for "public carry," not "concealed carry" in particular. Opp. 12; *Bruen* at 2138 n.9. According to Defendants' tortured logic, then, "as no permit is required for *open* carry in North Carolina," Defendants' actions in delaying permits for *concealed* carry do not implicate footnote nine of *Bruen*. Opp. 12. Of course, *Bruen* made no such hair-splitting distinctions and, indeed, the case focused on analysis of a *concealed* carry licensing regime. What is more, the Court in *Heller* explicitly rejected the idea that infringing some aspects of a constitutional right is permissible so long as other aspects are left open: "[i]t is no answer to say ... that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008). Likewise, it is "no answer" to claim that Defendants' permitting delays are permissible with respect to concealed carry simply because open carry is still technically lawful on some level. Defendants' actions are perhaps the most "cookie cutter" example of a violation of *Bruen*'s footnote nine that could be imagined.[6]

---

[6] Separately, Defendants appear to argue that the delays *of more than one year* experienced in this case are reasonable under *Bruen*. Opp. 13 ("*Bruen* does not stand for the proposition that any delay in obtaining a CHP is unconstitutional; certainly not a 'delay' caused by the time it may

More problematically, however, Defendants miss the forest for the trees, focusing *exclusively* on footnote nine of *Bruen* and failing to grasp the larger framework established by the Supreme Court for analyzing Second Amendment challenges. Indeed, although Plaintiffs argued (i) that Defendants' actions are *per se* violative of Second Amendment rights under footnote nine of *Bruen* without further analysis (ECF #10 at 12–14), they *also* argued (ii) that Defendants' actions are unconstitutional when subjected to *Bruen*'s historical analysis, which requires Defendants to provide a robust historical tradition of delays in concealed carry permitting (ECF #10 at 14–17). Yet Defendants provide no such historical defense in their opposition, failing to provide even a single historical example of such significant delays in any firearm permitting scheme. Indeed, as another federal court has concluded, "lacking, it appears, are historical analogues requiring a responsible, law-abiding citizen to even *apply* to be able to carry a gun." *Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 182965, at *27 (N.D.N.Y. Oct. 6, 2022).

---

take a mental health provider to produce its records; a delay which is completely outside of the Sheriff's control."). Defendants miss the mark on so many levels. First, they have admitted that the length of delay here is entirely within "the Sheriff's control," as Defendants have "discretion in the CHP process [regarding] what mental records to request." *Id.* Indeed, no other North Carolina sheriff has concocted a mental health request process such as that in Mecklenburg County. Second, if delays of *more than one year* simply to obtain a CHP are not beyond the pale, it is hard to imagine what length of delay Defendants would concede is too much. Indeed, Defendants admit that another federal district court has rejected a one-year delay to submit a permit application but posit that "[t]he individual Plaintiffs in this case have all had their CHP applications approved" — as if Defendant's actions after being sued absolve him of his prior constitutional violations (not to mention the numerous members and supporters of the organizational Plaintiffs who have not received their permits and continue to be harmed). *Id.* On the contrary, Plaintiffs' members and supporters continue to be irreparably harmed in this case, with *delays exceeding 13 months*. *See* Supplemental Declaration of Paul Valone at § 4.

Defendants were *required* to compile a historical record justifying their actions, but have entirely failed to do so. Thus, under *Bruen*, "the Constitution presumptively protects that conduct" which Defendant infringes (*id.* at 2126), and Plaintiffs are entitled to a preliminary injunction without further analysis (perhaps Defendants can try again at a later date to rebut the presumption). Nor is it this Court's role to supplement Defendants' brief on their behalf, or to scour the historical record to justify their actions. *See Bruen* at 2130 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. ... '[i]n our adversarial system of adjudication, we follow the principle of party presentation.' Courts are thus entitled to decide a case based on the historical record compiled *by the parties*."); at 2150 ("we are not obliged to sift the historical materials to sustain New York's statute. That is respondents' burden.") (emphasis added).

### 3. Defendants Have No Immunity Here.

In a wholly undeveloped section, Defendants next claim that they are immune from *federal* suit under the Second Amendment and Section 1983 because of a *North Carolina* statute which exempts the Sheriff under *state* law with respect to actions that the Sheriff *did not take* in this case. But again, "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Salamone*, 2020 U.S. Dist. LEXIS 23271, at *8. Notwithstanding their waived argument, Defendants' assertion is meritless.

First, Defendants claim that N.C.G.S. § 14-415.20 represents a prohibition on Plaintiffs' ability to bring a civil proceeding against Defendants for allegations that they

9

are unlawfully delaying the issuance of permits. Opp. 14. But what the statute *actually* provides is that a Sheriff "who issues or refuses to issue a permit to carry a concealed handgun ... shall not incur any civil or criminal liability." N.C.G.S. § 14-415.20. But this is not to immunize a sheriff from *failing to issue* permits; rather, it protects a sheriff from liability for improvidently granting a permit to someone who was prohibited or who may later commit a crime, or perhaps (arguably) someone who was denied a permit and then later harmed by a criminal. This intent was made evident during House Bill 90's enactment, as the provision was added after introduction because it was not included in the first iteration.[7] In the fifth version of H.B. 90, an amendment was added stating that "[a] sheriff who issues a permit to carry a concealed handgun under this Article shall not incur any civil or criminal liability."[8] It was then changed in the sixth version to the language currently existing.[9]

In stark contrast to the language of N.C.G.S. § 14-415.20, Defendants here have not "issue[d] or refuse[d] to issue a permit...." Rather, Defendants are erecting roadblocks to and delaying the issuance or denial of permits, making no decision either way. Under Defendants' warped interpretation of N.C.G.S. § 14-415.20, Sheriff McFadden could simply shut down his permitting office entirely, and yet have complete immunity from suit in any court.

---

[7] *See* https://www.ncleg.gov/Sessions/1995/Bills/House/PDF/H90v1.pdf.
[8] *See* https://www.ncleg.gov/Sessions/1995/Bills/House/PDF/H90v5.pdf.
[9] *See* https://www.ncleg.gov/Sessions/1995/Bills/House/PDF/H90v6.pdf.

Second, it should go without saying that a state legislature cannot purport to immunize state officials from federal suit alleging federal causes of action. To the extent that North Carolina has attempted to "express [its] legislative intent to free a sheriff from litigation such as this" (Opp. 14) (it has not), the Supremacy Clause would immediately invalidate such a statute. *See Ex parte Young*, 209 U.S. 123, 160 (1908) ("The State has no power to impart to [its officer] any immunity from responsibility to the supreme authority of the United States.").

Third, to the extent that Defendants appear to separately argue that they have some sort of Eleventh Amendment immunity ("in addition ... a sheriff's sovereign immunity for discretionary acts in general," Opp. 14), the *Ex Parte Young* doctrine closes that door as well. *See Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002) ("The *Ex Parte Young* exception to Eleventh Amendment immunity is designed to preserve the constitutional structure established by the Supremacy Clause. Thus, it allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute. ... [A] State officer who acts in violation of the Constitution is 'stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.'"); *see also Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) ("Eleventh Amendment immunity does not protect state officials in their official capacities from § 1983 claims for injunctive relief.").

### B. Plaintiffs Are Suffering Irreparable Harm.

Predictably, Defendants claim that Plaintiffs are not suffering irreparable harm on the theory that they "may legally purchase a handgun by obtaining a Pistol Purchase Permit ("PPP") through a process which is also administered by all North Carolina Sheriffs...." Opp. 15. Of course, Defendants' failure to timely issue PPPs was among the reasons that Plaintiffs were forced to sue him in state court last year, in order to force his compliance with the statutory deadlines. *See Gun Owners of America, Inc. v. McFadden*, 21-CVS-12654, General Court of Justice, Superior Court Division. Nor should Plaintiffs be required to submit *another* application to Defendants, pay *another* fee to process a different application, and wait *another* period of time in order to obtain *another* permit so that they can finally exercise their most basic Second Amendment right to acquire a handgun.

More fundamentally, however, even if Plaintiffs sought and obtained from Defendants a Pistol Purchase Permit, such a permit, as its name implies, entitles them only to "purchase" a "pistol" — not to carry it concealed in public. But Plaintiffs here seek to vindicate *all* their Second Amendment rights — not only the right to "keep" but also to "bear" arms. In response, Defendants demur that, even if Plaintiffs cannot "concealed carry" a firearm due to Defendants' infringements, at least they "can still 'open carry'" their handguns in public, "as North Carolina does not require any permit for open carry." Opp. 15. But this argument fails for several reasons. First, "open carry" is not a common behavior in modern society, and is not a realistic option for many gun owners, especially those who live in more urban settings like Mecklenburg County, those with small children, those at work, those who use public transit, *etc*. Moreover, as Defendants' own referenced

12
Case 3:22-cv-00630-MOC-DSC   Document 15   Filed 01/17/23   Page 12 of 20

case makes clear, gun owners who "open carry" firearms in North Carolina — even lawfully — are often reported to police through "man with a gun" calls, and are routinely treated with suspicion (if not open hostility) by responding law enforcement. *See State v. Mathis*, No. COA19-1062, 2020 N.C. App. LEXIS 752, at *2 274 N.C. App. 250 (Nov. 3, 2020) ("[T]hen-Officer Souther ... received a dispatch call that there was a Black man … walking with a shotgun down Salisbury Road.... When Deputy Souther arrived, he saw Defendant walking on the side of the road with chips, a drink, and a long gun concealed in part by a black jacket. Deputy Souther handcuffed Defendant almost immediately ... and told Defendant that he should have been carrying the shotgun in a case.").

What is more, it is up to Plaintiffs — not Defendants — to decide how to exercise their Second Amendment rights. No court would accept a protestation by government that it may ban the people's access to Twitter because they are still permitted to make Instagram posts. Indeed, the Supreme Court has flatly rejected such an argument. *See Heller*, 554 U.S. at 629. Here, Plaintiffs desire to exercise their right to "concealed carry" their firearms, and it is "no answer" for Defendants to opine that they may still engage in "open carry." Paraphrasing *Heller*, "[concealed carry is] the most popular [method of bearing arms] chosen by Americans for self-defense in [public], and [Defendants' infringement] of [that activity] is invalid." *Id.*

Next, and just as predictably, Defendants triumphantly declare that they have somehow mooted this case (or at least mooted the irreparable harm component) "because Williams and Yepko's CHP applications have been approved," and "Kane's CHP application was approved" but not yet issued. Opp. 15. On the contrary, the organizational

Plaintiffs have submitted declarations that they have *numerous* members and supporters who are being irreparably harmed by Sheriff McFadden's actions. Defendants have not claimed to have issued the permits for any (much less all) of these persons. Nor have they claimed that all of the members and supporters of the organizational Plaintiffs have received relief. As the attached supplemental declaration of Paul Valone shows (*see* Exhibit A), irreparable harm to Plaintiffs continues to occur in this case, with delays by Defendants *exceeding 13 months* in at least one case. *Id*. at § 4.

Finally, Defendants claim that Plaintiffs do not have irreparable harm because they somehow have an "expedited path to a temporary CHP" by arguing that they have a "demonstrable safety concern constituting an 'emergency situation.'" Opp. 16. According to Defendants, "Applicants claim they need emergency relief," but they have not sought an "emergency" CHP.[10] *Id.* But Defendants confuse apples and oranges. The relief that Plaintiffs seek on an expedited, preliminary injunction basis is to vindicate their *constitutional rights*, not merely to secure their *personal safety*. As Plaintiffs have explained, Defendants' infringement of these constitutional rights constitutes *per se* irreparable harm independent of the increased risk to Plaintiffs' personal safety. *See* ECF #10 at 19. Moreover, no Plaintiff in this case has alleged a "demonstrable safety concern constituting an 'emergency situation'" — essentially, the equivalent of a "unique need for self-defense" that was required by New York's repudiated "proper cause" standard. *Bruen* at 2125. Rather, Plaintiffs have alleged merely that they are "law-abiding citizens with

---

[10] Of course, this process is entirely discretionary, and certainly not "shall issue."

ordinary self-defense needs" who desire to "carry arms in public for that purpose." *See id.* at 2150.

Finally, Defendants posit that there is "no guarantee" that an armed person "will be able to defend themselves" if attacked. Opp. 16. On the contrary, self-defense uses of firearms are anything but "sheer fantasy," as Defendants claim. *See* W. English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, GEORGETOWN MCDONOUGH SCH. BUS. RSCH. PAPER NO. 4109494, at 1 (May 18, 2022) (estimating 1.67 million defensive uses of firearms annually). Regardless, the preliminary injunction standard, as Defendants admit, is being "likely to suffer irreparable harm," not the "guarantee" of irreparable harm.[11] *Cf.* Opp. 6 and 16. Based on the unavoidable fact that disarmed persons are far less likely to be able to successfully defend themselves from violent attack, Plaintiffs' legitimate concerns for their personal safety are neither "hysterical" nor "inflammatory." *See* Opp. 16.

At bottom, in spite of Defendants' numerous machinations to the contrary, should this Court find there to be a likelihood that Defendant is infringing Plaintiffs' constitutional rights, irreparable harm is established conclusively.

---

[11] Defendants question, with respect to self-defense, "what role does concealment play in it?" Opp. 16. Although not relevant to the outcome of this case, identifying the advantages of concealed carry over open carry is a simple exercise for any gun owner who possesses even a basic familiarity with bearing arms. For example, with concealed carry "[y]ou retain the element of surprise — [i]f an individual has become a threat, especially if there is a firearm involved, having the element of surprise on your side can give you the needed time to draw your firearm and get a shot on the target before they can react. The moments that are gained with a surprise can be crucial in life or death situations." B. Castillo, *Concealed Carry vs. Open Carry*, FOBUS HOLSTERS (Mar. 17, 2022), https://www.fobusholster.com/blogs/fobus-holster/concealed-carry-vs-open-carry.

## C. The Balance of the Equities Favors Plaintiffs.

Arguing that the equitable factors tilt against Plaintiffs, Defendants posit that "Plaintiffs are seeking to change the status quo, which in and of itself means that the balance of equities is not in their favor." Opp. 17. But this argument is entirely undeveloped, and therefore waived. *See Salamone*, 2020 U.S. Dist. LEXIS 23271, at *8. Even so, Defendants' characterization is not the law, and Defendants do not provide any legal authority to support their claim. Defendants' argument is essentially 'We've *always* violated the Second Amendment rights of Mecklenburg County residents.' On the contrary, in this case the status quo is the "status quo ante," which is the "last uncontested status between the parties which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012). Indeed, "'it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions' ... '[s]uch an injunction restores rather than disturbs, the status quo ante.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017). In this case, there was no "contested status between the parties" until Defendants violated Plaintiffs' rights by failing to promptly grant or deny their applications for CHPs. Adopting Defendants' argument, that the status quo incorporates their violations of other applicants' rights who came before Plaintiffs, would permit Defendants to continue infringing the Second Amendment with impunity.

Lastly, Defendants posit that "the notion that the desire of an individual who may suffer from mental illness to conceal a handgun in public is somehow more vital than first ensuring the ability of that individual safely to handle that handgun, offends all notions of logic and reason." Opp. 17. But Defendants tilt at windmills, as Plaintiffs never made that

"notion," but instead alleged that each of them is "a law-abiding person who can legally possess firearms, and is not disqualified from obtaining a CHP." *See* Compl., ECF #1 at ¶¶ 7–9. Adopting Defendants' argument would mean that taking *any amount of time* to issue a CHP would be permissible, so long as the Sheriff can posit that some idiosyncratic additional investigatory step he has chosen to take is designed to stop people with mental health issues from obtaining firearms.

On the contrary, literally every other North Carolina sheriff is able to issue CHPs within the statutory deadline — except Defendant McFadden. It is entirely unreasonable to believe that Defendant McFadden is the only sheriff within the state who is properly administering the statute. Indeed, Defendants' own actions in this case undermine his claim as, *within one week* of the filing of this case (November 28, 2022), Defendant granted permits to two of the individual Plaintiffs (December 5, 2022), one whom had been waiting for *more than a year*. *Cf.* ECF #1 *with* Opp. 15. This was no coincidence. Apparently, Defendants are suddenly able to conclude that an applicant is not a mental health risk *after being sued*.

### D.    The Public Interest Favors Plaintiffs.

Finally, Defendants argue that Defendants must rely on the North Carolina legislature to vindicate their Second Amendment rights. Opp. 18 ("[T]he proper avenue to pursue this agenda is must [sic] do so through the legislative process, not the judicial system [sic] the public is entitled to protection from handguns...."). But that is not how

constitutional rights, or judicial review, work.[12] Defendants speculate that "[h]andguns concealed by citizens who cannot safely handle them creates a clear and present danger to the community." Opp. 18. Yet Plaintiffs are no danger to the community, but rather are law-abiding, responsible persons legally and constitutionally entitled to CHPs. Defendants concede the point, as they have now granted the three named Plaintiffs their permits. Finally, Defendants argue circularly that the public interest supports them "continu[ing] to carry out the directives of that statute unless and until the statute is amended or struck down as unconstitutional," Opp. 18, apparently conceding that, if Plaintiffs are found likely to succeed on the merits, then the public interest favors granting Plaintiffs relief.

## CONCLUSION

Defendants repeatedly accuse Plaintiffs of "pushing an activist agenda...." Opp. 18, *see also* at 1–2, 17. On the contrary, Plaintiffs merely seek access to concealed handgun permits to which they are legally and constitutionally entitled. Defendants are projecting, and it is they who are the "activists," erecting idiosyncratic, anti-gun hurdles with the design and intent to delay the permitting process — tactics that no other North Carolina sheriff is using to infringe Second Amendment rights. The extreme nature of Defendants' actions, when compared to the rest of the state, indicates at first blush that something is not right in Mecklenburg County. And when Defendants' actions are measured against the Second Amendment and the analytical framework provided by *Bruen* (which Defendants

---

[12] Not to mention, "[t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications." *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010).

did not even attempt to rebut), it is evident that Defendants are infringing Second Amendment rights, and that the North Carolina mental health provisions permitting him the open-ended discretion to do so cannot stand. For the reasons stated, this Court should grant Plaintiffs' motion.

January 17, 2023

Respectfully Submitted,

*/s/ Robert Neal Hunter, Jr.*
Robert Neal Hunter, Jr. (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone: (336) 273-1600
Facsimile: (336) 274-4650
Email: rnhunterjr@greensborolaw.com

Ronald J. Shook, II (NCSB 43407)
THE LAW OFFICES OF RONALD J. SHOOK
121 E. Main Ave.
Gastonia, NC 28012
Telephone: 704-671-2390
Facsimile: 704-671-4431
Email: ron@rjshooklaw.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on this date, January 17, 2023, I caused the foregoing document to be filed and served on all counsel of record by operation of CM/ECF system for the United States District Court for the Western District of North Carolina.

*/s/ Robert Neal Hunter, Jr.*
Robert Neal Hunter, Jr. (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone: (336) 273-1600
Facsimile: (336) 274-4650
Email: rnhunterjr@greensborolaw.com

Ronald J. Shook, II (NCSB 43407)
THE LAW OFFICES OF RONALD J. SHOOK
121 E. Main Ave.
Gastonia, NC 28012
Telephone: 704-671-2390
Facsimile: 704-671-4431
Email: ron@rjshooklaw.com

*Attorneys for Plaintiffs*