IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:22-cv-630-MOC-DSC

SARA BETH WILLIAMS, BRUCE )
KANE, JASON YEPKO, GUN OWNERS )
OF AMERICA, INC., GUN OWNERS )
FOUNDATION, GRASS ROOTS NORTH )
CAROLINA, and RIGHTS WATCH )
INTERNATIONAL, )
              )
      Plaintiffs, )
              )
v. )
              )
SHERIFF GARRY MCFADDEN, )
in his official capacity as )
Sheriff of Mecklenburg County, )
and the MECKLENBURG COUNTY )
SHERIFF'S OFFICE, )
              )
      Defendants. )
_____)

## PLAINTIFFS' RESPONSE TO NORTH CAROLINA'S MEMORANDUM SUPPORTING DEFENDANTS' MOTION TO DISMISS

  When a statutory scheme violates the Second Amendment's "unqualified command," the scheme is presumed unconstitutional unless and until a governmental party proves the original public understanding of the right to keep and bear arms accommodated such a scheme. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022) (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). Because Plaintiffs have made their textual showing in accordance with *Bruen*'s framework as to the Mental Health Provisions ("MHP"), Defendants' Motion to Dismiss must fail.

## I. *Bruen* Dispenses with the State's Facial-as-Applied Distinction.

The State claims that, because Plaintiffs have noted that most North Carolina sheriffs administer the licensing scheme without delay, they cannot bring a facial challenge to the MHP. Memorandum of the State of North Carolina in Support of Defendants' Motion to Dismiss, ECF #23 ("State Br."), at 5. According to the State, the problem of which Plaintiffs complain exists "only in certain scenarios," as "under *most* circumstances sheriffs" act constitutionally, making Defendants' actions "the exception, not the rule." *Id*. at 5-6. The State claims that this "would be consistent with *Bruen*," yet cites only Justice Kavanaugh's concurrence for its claim that Plaintiffs may bring only an as-applied challenge. *Id*. at 3, 6, 8.

But as the State acknowledges, Plaintiffs challenge not only (i) the Sheriff's "implementation of certain provisions of North Carolina's concealed handgun licensing regime," but also (ii) the constitutionality of "the Mental Health Provisions" because "they grant unfettered discretion to local sheriffs…." *Id.* at 2, 4. In other words, the State is well aware, and there is no confusion about, the facial challenge Plaintiffs have brought. It may be true that "he who writes the resolved clause wins the debate" (M.S. Evans), but here Plaintiffs are masters of their own complaint, and the State may not cabin their claims to those ones the State would prefer (those that do not challenge the constitutionality of a state statute). Plaintiffs' allegations are abundantly clear that the problem in this case is not only the *abuse* of discretion by the Sheriff but also the *grant* of discretion by the statute. Compl., ECF #1, ¶¶ 3, 4, 10, 22, 24, 83, 93.

The State's curious theory, that Plaintiffs cannot raise a facial challenge to the MHP unless and until *every* Sheriff exercises the unbridled discretion they grant (State Br. at 5, until "no set of circumstances exists under which an act would be valid"), is belied by *Bruen* itself. In reapplying its standard of review from *Heller*, the *Bruen* Court never considered the distinction between facial and as-applied challenges to New York's statutory scheme, but instead struck down the offending discretionary provision of "proper cause" despite its sometimes-constitutional implementation. *See Bruen*, 142 S. Ct. at 2122–25 (discussing petitioners' license denials for lacking "proper cause"); *see also* Complaint ¶¶ 2–4, *Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022) (No. 1:22-CV-0986 (GTS/CFH)) (listing New York residents who had been issued "unrestricted" carry licenses pre-*Bruen* in 2009, 2019, and 1994, despite the restrictive "proper cause" standard). Indeed, even prior to *Bruen*, many of New York's sheriffs simply ignored the "proper cause" requirement, deeming "self-defense" to constitute "proper cause" and issuing unrestricted carry licenses in essentially a "shall issue" manner. And yet the *Bruen* Court had no qualms about invalidating the New York statute, even though (very much like the situation in North Carolina) some New York sheriffs did not actually use or abuse the discretion it provided to violate the Second Amendment rights of their residents.

This point bears emphasis—the problem in *Bruen*, like here, was that the statute *allowed for* discretion in every case, which inevitably led to abuses in many cases. *See Bruen*, 142 S. Ct. at 2123 n.1, 2138 n.9. It did not matter to the *Bruen* Court that some licensing authorities *could have* administered the scheme constitutionally; the provision

3

itself operated broadly to "prevent[] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," so it was constitutionally untenable. *Id.* at 2156.

Finally, as Plaintiffs' have argued, *Bruen* expressly sanctioned (if not invited) the very sort of challenge that Plaintiffs bring here, noting that "we do not rule out constitutional challenges to *shall-issue regimes*" that are "put toward *abusive ends*," causing "lengthy wait times in processing license applications…." *Id.* at 2138 n.9 (emphasis added). The Court did not invite "constitutional challenges to … *abusive ends*" but "to … *regimes*" (*i.e.*, facial challenges), making clear that the regimes themselves would be vulnerable to challenge because, again, the statutes that grant unfettered discretion are the constitutional problem.

## II. A Motion to Dismiss Is Not the Place to Litigate "the Merits." Regardless, *Bruen* Creates the Opposite "Presumption" the State Advances.

Echoing Defendants' improper merits arguments made in a motion to dismiss (*see* ECF #21, at 5–11, collecting and rebutting these merits arguments), the State claims that the MHP are "presumptively constitutional" under *Bruen*, repeatedly seeking to characterize the MHP as nothing more than part of a "shall issue" licensing regime which grants licenses based on "'certain threshold requirements,'" and which does not "'grant[] licensing officials discretion to deny licenses based on a perceived lack of need or suitability.'" State Br. at 3, 7 (citing *Bruen*, 142 S. Ct. at 2123); *see also* at 8. The State claims that, under *Bruen*, such purportedly permissible licensing "criteria" may "contain[] only 'narrow, objective, and definite standards,'" but not "discretionary criteria." *Id*. at 8.

4

Case 3:22-cv-00630-MOC-SCR   Document 25   Filed 03/07/23   Page 4 of 13

Claiming that the MHP contain only objective standards, the State concludes they are "constitutionally permissible on [their] face." *Id*. at 9.

The State's claim is clearly erroneous – that the MHP can claim refugee status under North Carolina's otherwise allegedly "shall issue" framework, which purportedly is "presumptively constitutional."[1] For starters, the MHP provide precisely the unbridled discretion that *Bruen* rejected and permit precisely the "lengthy delay" to which *Bruen's* footnote 9 invited future challenge. *See* ECF #21, at 2 n.1 (noting delays exceeding 13 months). In fact, in the very same breath as it claims the MHP grant no discretion, the State summarizes the MHP where the Sheriff is "charged with determining the 'qualification or competency'" of an applicant, including "'capacity'" – *in addition to* objective "'record checks.'" State Br. at 3. If that is not a subjective and discretionary determination of "suitability," it is hard to see what would qualify. In other word, the MHP, on their face, flunk the *Bruen* test.

But more than that, the *Bruen* Court created no exceptions to its analytical framework. *Bruen*, 142 S. Ct. at 2126 (stating explicitly that if "the Second Amendment's plain text covers an individual's conduct," then "the government must demonstrate that the

---

[1] The State appears to suggest that the *Bruen* Court issued an advisory opinion on the constitutionality of "shall issue" regimes that were not before the Court, and without a shred of the historical analysis required by *Bruen*'s no-exceptions text-and-history standard. On the contrary, the Court's discussions of other jurisdictions merely highlighted the egregiousness of the New York regime immediately at issue. *See Bruen*, 142 S. Ct. at 2138 n.9 (emphasis added) (noting that other jurisdictions "*do not necessarily prevent*" the exercise of Second Amendment rights and that their permitting schemes "*appear*" to have certain features). These are not conclusive statements about the constitutionality of shall-issue regimes or their requirements, but rather means of distinguishing other regimes from New York's. These statements in no way provide absolution for the MHP. Indeed, the *Bruen* Court expressed no opinion as to the constitutionality of "mental health records check[s]," discussion of which appear only in Justice Kavanaugh's concurrence, which was not joined by a majority of the Court and is not the law. *See id.* at 2162 (Kavanaugh, J., concurring).

regulation is consistent with this Nation's historical tradition of firearm regulation"). In fact, the *Heller* Court, whose standard of review the *Bruen* Court merely clarified and reapplied, expressly contemplated challenges to even those laws that enjoy an apparent presumption of constitutionality from judicial dicta. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("And there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."). In the State's world, however, "presumptively" means "conclusively," leaving Plaintiffs no opportunity to rebut any alleged presumption. That is not the law.[2]

Nor is a state's arbitrary labeling of its permitting scheme as "shall issue" some magical incantation that conclusively proves a law's constitutionality. Neither *Heller*, nor *McDonald*, nor *Bruen* established some broad class of definitively constitutional firearm regulations that are immune from constitutional scrutiny or exempt from *Bruen*'s test. Rather, once a plaintiff has alleged a course of conduct covered by the Second

---

[2] Plaintiffs reject the premise that the MHP are even presumptively constitutional. Nowhere in *Heller*, *McDonald*, or *Bruen* did a majority (or even a plurality) flag such a provision as presumptively constitutional. *See Heller*, 554 U.S. at 626–27 (emphasis added) (noting only "longstanding *prohibitions* on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms"); *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (omitting any mention of presumptively constitutional restrictions); *Bruen*, 142 S. Ct. at 2138 n.9 (refusing to characterize certain jurisdictions' carry licensing regimes as unconstitutional). The State appears to theorize that, since the MHP involve a determination of whether someone is "mentally ill," then they are constitutional per se. State Br. at 9. This reasoning confuses the "how and why" metrics that the *Bruen* Court identified as "'*central*' considerations" when justifying a modern regulation. *Bruen*, 142 S. Ct. at 2133. But in any case, these metrics apply when assessing the relevant similarity of historical analogues proffered—something Defendants fail to do altogether. *See id.*; ECF #21, at 7 (noting that Defendants "*forgot* to engage in the historical analysis and *failed* to provide the historical analogues that *Bruen* mandates"). Moreover, this sort of contention—that *Bruen* somehow approved of or endorsed other regimes not at issue—has already been dismissed as "just disingenuous" by at least one other district court. *See* Transcript of Oral Argument on Plaintiffs' Motion for Preliminary Injunction at 58–60, *Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022) (No. 1:22-CV-0986 (GTS/CFH)) available at https://bit.ly/3WPtBwo.

Amendment's plain text, then any dicta-derived presumption of constitutionality disappears entirely and in fact becomes a presumption of *unconstitutionality*. *Bruen*, 142 S. Ct. at 2126 (emphasis added) (creating precisely the opposite "presumption" than the State advances, explaining that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution *presumptively protects* that conduct.").

Nor is a *grant of discretion* the only way to violate the Second Amendment, while all "objective" regulations are permissible. It cannot possibly be the case that mere lack of discretion can transform a regulation infringing on the right to keep and bear arms into one that is constitutionally permissible – if that were true, then any regulation, including total or de facto prohibitions, would pass muster, so long as the government exercised no discretion in enforcing them. For example, the statute at issue in *Heller* did not grant any discretion at all to officials, instead uniformly (and objectively) "generally prohibit[ing] the possession of handguns." *Heller*, 554 U.S. at 574. The State's broad notion that it may disarm persons under a "shall issue" licensing regime, so long as it does so based on "'narrow, objective, and definite standards,'" immune from constitutional challenge, would permit North Carolina even to return to the racist roots of the state's gun control statutes. *See* Clayton E. Cramer, *North Carolina's Permit to Purchase Law: The Rumble Seat of Gun Control Laws?*, SSRN 5–7, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759091 (July 23, 2016) (collecting evidence "suggest[ing] that the [PPP] law was intended to be enforced in a racially discriminatory manner," and including early 20th-century newspapers reporting that nearly every person charged with carrying a concealed firearm was "colored.")

7

At bottom, the State recognizes that "'the Second Amendment protects the right of *law-abiding* people to carry a gun outside the home for self-defense." State Br. at 9 (citing *Bruen*, 142 S. Ct. at 2159). Yet in this case, the MHP have operated to allow the Sheriff to deprive Plaintiffs, along with the organizational Plaintiffs' members and supporters, of that right for up to and exceeding *one year*. The MHP thus clearly violates the Second Amendment's guarantee. But either way, the State's arguments raised in its brief are not issues to be decided on a motion to dismiss.

### III. Plaintiffs' Fourteenth Amendment Claims Stand Alone.

The State again attempts to limit the claims that Plaintiffs can bring, alleging that their due process and equal protection claims "are based on the same set of facts underpinning their Second Amendment claim and seek the same relief…." State Br. at 10. This is a bit like saying that, if the police stop and frisk a person and seize his lawfully carried firearm, he can bring only a Second Amendment or Fourth Amendment claim, but not both. On the contrary, one "set of facts" can give rise to multiple constitutional violations. *Presley v. City of Charlottesville*, 464 F.3d 480, 484 (4th Cir. 2006) ("[T]he Supreme Court has time and again considered multiple constitutional claims based on the same facts.").

With respect to the State's due process arguments, Plaintiffs have dealt with these issues in their response to Defendants' Motion to Dismiss. *See* ECF #21 at 12–13. Although the merits of this constitutional claim have yet to be briefed, Plaintiffs are not alleging a Fourteenth Amendment right to carry a gun in public, but rather (with respect to due process) the right to be free from arbitrary and capricious action by Defendant

8
Case 3:22-cv-00630-MOC-SCR   Document 25   Filed 03/07/23   Page 8 of 13

McFadden, which is permitted by the MHP, and (with respect to equal protection) not to be treated dissimilarly from North Carolina residents in every other county but Mecklenburg County. These are quintessential Fourteenth Amendment claims which do not revolve around the Second Amendment, but could involve any constitutional right (for example, a First Amendment challenge to a county ordinance that imposes a waiting period in order to Tweet).

Finally, the State claims that Plaintiffs cannot make an equal protection showing because gun owners have not been declared a suspect class and because their "Second Amendment claim is meritless."[3] State Br. at 10-11. Obviously, for the reasons stated, Plaintiffs disagree with the latter claim. But even if neither criteria was met, the State apparently fails to recognize door number three – that a statute must still "bear[] a rational relation to some legitimate end." *Id.* at 10 (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). The State does not attempt to make such a showing here, likely because it is unwilling to defend Defendant McFadden's extreme actions in this case, creating year-long delays in the permitting process simply to exercise an enumerated constitutional right. Nor is there any rational basis for the Sheriff's actions, as every single other sheriff in North Carolina is able to process CHP applications without delay.

---

[3] The State thereby undermines its own argument that one "set of facts" cannot give rise to more than one constitutional violation, admitting that analysis of Plaintiffs' equal protection claim involves examination of Second Amendment issues.

9
Case 3:22-cv-00630-MOC-SCR   Document 25   Filed 03/07/23   Page 9 of 13

## IV. This Court Should Not Consider Defendants' Newly Raised Arguments.

In their reply brief supporting their motion to dismiss Defendants – entirely improperly – finally attempt to provide historical analogues pursuant to *Bruen*. ECF #24 at 7-9. This analysis was completely missing from both Defendants' preliminary injunction response brief, and their motion to dismiss. Although Defendants' eleventh hour analogues are, at this point, twice waived – not to mention they represent merits arguments properly resolved on Plaintiffs' preliminary injunction motion, not Defendants' motion to dismiss – they are also entirely unhelpful, consisting only of vague references to alleged historical laws "disarming dangerous persons," unlike the MHP, which require Plaintiffs to prove affirmatively that they are not within one of those classes of prohibited persons.

Defendants' reliance on such sources confuses *Bruen's* "how and why" (*Bruen*, 142 S. Ct. at 2133), wrongly assuming that any statutory *means* (the "how") is permissible so long as the purported *end* (the "why") is to keep a prohibited person from accessing a firearm. This illogical argument would justify all sorts of abuses, such as a sheriff's demand to interview minor children, away from their parents, to find out if Mommy has ever smoked a "funny cigarette," on the theory that the sheriff is enforcing the prohibited person prohibition found in N.C.G.S. § 14-415.12(b)(5). Similarly, it would justify, prior to obtaining a permit, a police search of a person's cellular phone, computer, and home, in order to ensure that no criminal activity is afoot – not to mention a hair sample or DNA swab to be matched against evidence from unsolved crimes.

Making matters even worse for Defendants' argument, they still *do not actually reference or provide any historical sources* (much less in sufficient number and scope to

10
Case 3:22-cv-00630-MOC-SCR   Document 25   Filed 03/07/23   Page 10 of 13

evidence a broad and enduring historical tradition sufficient to demonstrate that the nation's founding generation would have widely considered certain regulations to be completely outside the scope of the protections secured by the Second Amendment). Instead, Defendants reference other sources (one treatise, three law review articles, and three court decisions) which purportedly, in turn, reference historical sources. This Court cannot accept multiple levels of hearsay as satisfying the *Bruen* historical analysis, and neither Plaintiffs nor this Court is "obliged to sift the historical materials for evidence to sustain [North Carolina] statute." *Bruen* at 2150. Nor are any such sources likely to exist. *See Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 182965, at *27 (N.D.N.Y. Oct. 6, 2022) ("However, just as lacking, it appears, are historical analogues requiring a responsible, law-abiding citizen to even *apply* to be able to carry a gun.").

Finally, Defendants claim broadly that the state may "disarm[] unvirtuous citizens" (State Br. at 8), but this notion was implicitly rejected in *Bruen* (at 2123 and n.1) and explicitly rejected by then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019), where she explained that "that power [to disarm people who are dangerous] extends only to people who are dangerous," whereas the MHP extend to everyone, including Plaintiffs who are not dangerous, but rather are "ordinary, law-abiding, adult citizens…." *Kanter* at 451; *Bruen* at 2134. Explicitly rejecting the position Defendants advance here, Judge Barrett's *Kanter* opinion explained that there was no "evidence that founding-era legislatures imposed virtue-based restrictions on the right…." *Id*. at 451; *see also* at 462-63 ("virtue exclusions … don't apply to the Second Amendment," specifically

11

rejecting the very same "virtue requirement" argument by the very same legal scholar who Defendants' brief cites).

As noted above, Defendants have had repeated opportunities to provide this Court with historical analogues under *Bruen*, but failed to do so.  And "[a]s a general rule, arguments not specifically raised and addressed in opening brief, but raised for the first time in reply, are deemed waived." *Moseley v. Branker*, 550 F.3d 312, 325 n.7 (4th Cir. 2008) (citation omitted).  This Court should decline to consider Defendants' newly raised arguments.

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss.

Respectfully submitted,

March 7, 2023

/s/ Robert Neal Hunter, Jr.
Robert Neal Hunter, Jr.  (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone: (336) 273-1600
Facsimile: (336) 274-4650
Email:  rnhunterjr@greensborolaw.com

Ronald J. Shook, II  (NCSB 43407)
THE LAW OFFICES OF RONALD J. SHOOK
121 E. Main Ave.
Gastonia, NC 28012
Telephone: 704-671-2390
Facsimile:   704-671-4431
Email:  ron@rjshooklaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, March 7, 2023, I caused the foregoing document to be filed and served on all counsel of record by operation of CM/ECF system for the United States District Court for the Western District of North Carolina.

*/s/ Robert Neal Hunter, Jr.*
Robert Neal Hunter, Jr. (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone: (336) 273-1600
Facsimile: (336) 274-4650
Email: rnhunterjr@greensborolaw.com

Ronald J. Shook, II (NCSB 43407)
THE LAW OFFICES OF RONALD J. SHOOK
121 E. Main Ave.
Gastonia, NC 28012
Telephone: 704-671-2390
Facsimile: 704-671-4431
Email: ron@rjshooklaw.com

*Attorneys for Plaintiffs*
